**TIMOTHY J. RYAN (SBN 99542)**
**REBEKKA R. MARTORANO (SBN 173600)**
**THE RYAN LAW GROUP**
400 Capitol Mall, Suite 2540
Sacramento, California 95814
Telephone: (916) 924-1912
Facsimile: (916) 923-3872
tryan@ryanlg.com
rmartorano@ryanlg.com

Attorneys for Defendant
DEERE & COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER BANDA and ELIDA BANDA,<br><br>          Plaintiffs,<br><br>     v.<br><br>JOHN DEERE; HERC RENTALS, INC.;<br>and DOES 1 - 100 inclusive,<br><br>          Defendants.<br>──────────────────────────<br>TRAVELERS PROPERTY CASUALTY<br>COMPANY OF AMERICA,<br><br>          Intervenor,<br><br>DEERE & COMPANY; HERC RENTALS,<br>INC.; and Roes 1 to 20,<br><br>          Defendants in Intervention.<br>────────────────────────── | Case No. 3:18-CV-05329-JCS<br><br>**DECLARATION OF REBEKKA R.**<br>**MARTORANO IN SUPPORT OF**<br>**DEFENDANT DEERE & COMPANY'S**<br>**OPPOSITION TO PLAINTIFFS'**<br>***DAUBERT* MOTIONS TO LIMIT**<br>**TESTIMONY OF CHARLES MAHLA**<br>**AND CAROL HYLAND**<br><br>Date:  January 17, 2020<br>Time: 9:30 a.m.<br>Trial Date: April 6, 2020<br><br>Honorable Joseph C. Spero<br>Courtroom G, 15th Floor |

///

///

I, Rebekka Martorano, declare:

1.      I am an attorney at law licensed to practice before all Courts of the State of California and the United States District Court, Northern District of California. I am counsel of record for Defendant Deere & Company in this action. I am personally familiar with the facts stated herein. I make this declaration in support of Defendant Deere & Company's Opposition to Plaintiffs' *Daubert* Motions to Limit Testimony of Charles Mahla and Carol Hyland.

2.      Attached hereto as Exhibit A is a true and correct copy of Charles Mahla's expert report dated September 30, 2019.

3.      Attached hereto as Exhibit B is a true and correct copy of Charles Mahla's supplemental expert report dated October 15, 2019.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the deposition of Richard Barnes taken on October 18, 2019.

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the deposition of Charles Mahla taken on October 25, 2019.

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts from Life and Worklife Expectancies, Second Edition, Hugh Richards and Michael Donaldson (ed.), Lawyers & Judges Publishing, January 1, 2010.

7.      Attached hereto as Exhibit F is a true and correct copy of the life care plan prepared by Diana Bubanja dated September 9, 2019.

8.      Attached hereto as Exhibit G is a true and correct copy of excerpts from the deposition of Jason Schott dated October 4, 2019.

9.      Attached hereto as Exhibit H is a true and correct copy of Maria Brady's Vocational Consultation Report dated September 10, 2019.

10.     Attached hereto as Exhibit I is a true and correct copy of Carol Hyland's Rebuttal Vocational Evaluation dated September 30, 2019.

11.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the deposition of Carol Hyland taken on November 8, 2019.

1       I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration was executed on December 6,

3  2019 in Sacramento, California.

4

5                           */s/ Rebekka Martorano*

                         Rebekka Martorano

DECLARATION OF REBEKKA R. MARTORANO IN SUPPORT OF DEFENDANT DEERE & COMPANY'S OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTIONS TO LIMIT TESTIMONY OF CHARLES MAHLA AND CAROL HYLAND

3

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER BANDA and ELIDA BANDA, | CASE NO: 18-cv-05329-JCS |
| Plaintiff, | |
| vs. | **EXPERT REPORT OF** |
| HERC Rentals, Inc.; et al., | **CHARLES R. MAHLA, PH.D.** |
| Defendants. | |

## <u>Introduction</u>

1.    I am a Managing Director and Senior Economist with Econ One, an economic research and consulting firm with offices in Los Angeles, Sacramento, Denver, Houston, Lafayette, Memphis, New York, and Washington D.C.  I have a bachelor's degree in economics from Lafayette College and a doctoral degree in economics from the University of North Carolina at Chapel Hill.  During the nearly 26 years of my professional career, I have worked extensively on the analysis of markets and the assessment of economic damages and their valuation, as well as the assessment of firm value.  In addition, I have performed analyses of losses arising from personal injury, wrongful death, employment discrimination, and wrongful termination.  I have testified as an expert witness in State and Federal

Courts.   A more detailed summary of my training, past experience and prior testimony is shown in **Tab 1**.

2.    Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $560 per hour.   Also, Econ One is being compensated for time spent by research staff on this project at their normal and customary hourly rates, ranging from $115 to $235 per hour.

**<u>Assignment</u>**

3.    I have been asked by counsel for defendants to conduct an analysis and to provide an estimate of Mr. Banda's past and future economic loss of earnings and benefits arising from his injury on August 22, 2017,[1] comparing his pre-injury employment under the Laborers' International Union with a post-injury employment scenario that assumes that Mr. Banda would be able to return to work in a sedentary position[2] in May 2020.

4.    In addition, I have been asked by counsel to conduct an analysis of the present value of the cost of future medical care based on information provided by Dr. Diana Bubanja.[3]   I have been provided by counsel with an alternative replacement schedule for Mr. Banda's future prosthetic needs, which I have been asked to incorporate into my analysis.

---

[1] See Complaint, p. 3.
[2] See Carol Hyland, Rebuttal Vocational Evaluation, September 30, 2019, p. 4.
[3] See Dr. Diana Bubanja, Life Care Plan for Javier Banda, September 9, 2019.

5.    In connection with this assignment, my staff and I have reviewed publicly available documents, court filings, depositions, and materials produced during discovery in this matter.  A list of the materials reviewed to date is shown in **Tab 2**.

## Summary of Conclusions

6.    A summary of my estimate of the economic losses to Mr. Banda, totaling $1,892,461 in lost earnings and benefits, and future life care plan costs, is contained in **Tab 3**.   Detailed calculations of these estimates are contained in **Tabs 4 - 13**.

## Calculation of Lost Earnings and Benefits

7.    Mr. Banda's lost income is made up of two principle components: 1) lost earnings and benefits during his worklife, and 2) lost pension benefits during his retirement.   I have therefore separated Mr. Banda's life into two distinct periods: a worklife period ranging from August 2017 through June 2033,[4] and a retirement period ranging from July 2033 through February 2054.[5]

---

[4]  Worklife earnings are calculated through June 2033, reflecting the end of Mr. Banda's statistical worklife, which is 16.1 years (through June 17, 2033) for a 45-year-old Hispanic male (Mr. Banda's age at the time of his injury) with less than a high school education.  See "Table 4: Worklife expectancies, increment-decrement methodology, by sex, race, Hispanic origin, and education," Life and Worklife Expectancies, Second Edition, Hugh Richards and Michael Donaldson (ed.), Lawyers & Judges Publishing, January 1, 2010.

[5]  Damages are calculated through February 2054, reflecting the life expectancy (33.8 years through February 28, 2054) of a 48-year-old Hispanic male (Mr. Banda's approximate age at the time of trial).  See National Center for Health Statistics, United States Life Tables, 2017, June 24,

## A. Income and Benefits without Injury

8.     For the purposes of this analysis, Mr. Banda's earnings reflect Mr. Richard Barnes' 2017-2020 estimated W-2 earnings, which includes base earnings and vacation/holiday pay, less union dues, and assumes 1,450 hours per year.[6]  I have allowed these earnings to grow annually beginning in 2021 at 2.00 percent, the 10-year compound annual growth rate of the Bureau of Labor Statistics' Employment Cost Index.[7]  See **Tab 4**, col. (2).

9.     As a member of the Laborers' International Union, Mr. Banda would also receive hourly health and annuity benefits, which I have calculated based on 2017-2019 actual contracted rates.[8]  I have also allowed these benefits to grow annually beginning in July 2020 at 2.00 percent.  See **Tab 4**, cols. (3)-(4).

10.     With each successive year of employment, Mr. Banda would also earn incremental credits towards his pension benefits.  I have estimated these incremental benefits based on the current contracted contribution and benefit rates,[9] and adjusted the full retirement benefits to reflect Mr. Banda's assumed

---

2019, "Table 11: Life table for Hispanic males," https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_07-508.pdf.
[6] See Report of Richard Barnes, September 16, 2019, Earnings & Benefits, pp. 4-5.
[7] See Bureau of Labor Statistics, Employment Cost Index - Wages and Salaries, Civilian Workers, Series CIU1020000000000I, http://www.bls.gov/ncs/ect.
[8] See Northern California AGC / Laborers Master Agreement, Northern California District Council of Laborers, Wage and Benefit Allocation Notices, June 26, 2017 (http://ncdc-laborers.org/wp-content/uploads/2019/04/2017waf.pdf), June 25, 2018, and July 1, 2018.
[9] The monthly benefit payable under the Laborers Pension is equal to 2.30% of the first $2.16 per hour in retirement contributions.  For the purposes of this analysis, benefits are assumed to remain at this level into the future.  See Laborers Pension Trust Fund for Northern California Pension Plan, Summary Plan Description, December 1, 2016, p. 22, https://norcalaborers.org/assets/FormsPublication/LAB-Pension-SPD-12-2016-English.pdf.

retirement age of 61 years.[10]  See **Tab 5**.  These benefits are assumed to begin in July 2033, following Mr. Banda's retirement.  See **Tab 6**.

### B.  Income and Benefits with Injury

11.     Per vocational expert Carol Hyland, Mr. Banda would be able to return to employment in a sedentary position (such as a motel desk clerk, security guard, or cashier) following vocational training.[11]  Per counsel, I have been asked to assume that a 6 to 9 month training period would begin at the date of this report, and that Mr. Banda would resume employment in mid-May 2020 at 4 hours per day for 4 to 6 weeks, increasing to 6 hours per day for 4 weeks, then reaching full-time employment (in August 2020).[12]

12.     Per Ms. Hyland, Mr. Banda could expect to earn $11.36 - $11.76 per hour (in 2017 dollars) upon resuming employment, with wages increasing to $11.93 - $12.81 per hour (in 2017 dollars).  For the purposes of this analysis, I have calculated Mr. Banda's earnings based on the scheduled State of California minimum wage of $13.00 per hour as of January 2020, $14.00 as of January 2021, and $15.00 as of January 2022, assuming 2,080 hours per year.[13]  I have

---

[10] The Laborers Pension Plan has a normal retirement age of 65, with a 0.25% reduction in the pension benefit for each month prior to age 65 (Mr. Banda is assumed to retire at the end of June 2033, which is 47 months prior to reaching age 65 in May 2037.  See Laborers Pension Trust Fund for Northern California Pension Plan, Summary Plan Description, December 1, 2016, p. 24, https://norcalaborers.org/assets/FormsPublication/LAB-Pension-SPD-12-2016-English.pdf.

[11] See Carol Hyland, Rebuttal Vocational Evaluation, September 30, 2019, p. 4.

[12] See Maria Brady, Vocational Consultation Report, September 10, 2019, p. 9

[13] See State of California Department of Industrial Relations, Minimum Wage, https://www.dir.ca.gov/dlse/faq_minimumwage.htm.

allowed these earnings to grow annually beginning in 2023 at 2.00 percent, the 10-year compound annual growth rate of the Bureau of Labor Statistics' Employment Cost Index.[14]  See **Tab 7**, col. (2).

13.    For the purposes of this analysis, I have also included the value of health benefits based on the average employer contribution towards those benefits, using the Bureau of Labor Statistics' Employer Costs for Employee Compensation figures for health insurance.  I have estimated these benefits at $6,624 per year in 2020 dollars, and have allowed those benefits to grow at 2.86 percent per year.[15] See **Tab 7**, col. (3).


**Calculation of the Cost of Future Care**

14.    Dr. Diana Bubanja provided a series of treatments that Mr. Banda will need as a result of his injuries, with categories including medical care, evaluations, therapeutic modalities, medications, diagnostic studies, durable medical equipment, adaptive aids, prosthetics, health care providers, health and maintenance, transportation, and home modifications.  Dr. Bubanja provided the cost and frequency of each treatment, as well as when those treatment could be expected to occur.  I have been provided by counsel with an alternative

---

[14] See Bureau of Labor Statistics, Employment Cost Index - Wages and Salaries, Civilian Workers, Series CIU1020000000000I, http://www.bls.gov/ncs/ect.

[15] Benefits in 2021 and later are assumed to grow annually at the compound annual growth rate from 2008-2018 of the hourly employer cost of health insurance benefits for Civilian Occupations (from $2.27 to $3.01).   See Bureau of Labor Statistics, Employer Costs for Employee Compensation, Series CMU1150000000000D, http://www.bls.gov/ncs/ect/.

replacement schedule for Mr. Banda's future prosthetic needs, which I have been asked to incorporate into my analysis.

15.    I have allowed the expenses outlined by Dr. Bubanja to grow annually based on various inflation rates, ranging from -0.38 percent to 3.39 percent, depending upon the service or treatment provided.[16]  See **Tabs 8 - 12**.

## Discounting Future Value to Present Value

16.    The final step in calculating Mr. Banda's losses entails the adjusting of future values into present value terms.[17]  I have used a discount rate of 2.89 percent, which is the rate of interest on an equally-weighted portfolio of interest-bearing bonds of varying duration.[18]  I have utilized U.S. government securities in this portfolio as they entail minimum risk.  See **Tab 13**.

## Conclusion

17.    As shown on **Tab 3**, Mr. Banda has suffered losses of earnings and benefits as a result of his injury, including past losses of $171,688 and future losses with a present value of $534,347, for a total of $706,034.  Additionally, the

---

[16] Inflation rates are calculated using the compound annual growth rate from 2008-2018 of the corresponding CPI Index.  See Bureau of Labor Statistics, Consumer Price Index - All Urban Consumers, http://www.bls.gov/cpi/home.htm.

[17] Based on the scheduled trial date in this matter of April 6, 2020, I have used May 1, 2020 as the demarcation between past and future, and discount future earnings and benefits to that date.

[18] Calculated using the average of the selected Daily Treasury Yield Curve Rates for the 10-year period leading up to October 1, 2019.  See US Department of the Treasury, http://www.ustreas.gov/offices/domestic-finance/debt-management/interest-rate/yield.shtml.

cost of Mr. Banda's future care has a present value of $1,186,427.  Combined, Mr.

Banda's total losses of earnings and benefits, plus the cost of his future care, total

$1,892,461.

_____
Charles R. Mahla, Ph.D.
September 30, 2019

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER BANDA and ELIDA BANDA, | CASE NO: 18-cv-05329-JCS |
| Plaintiff, | |
| vs. | **SUPPLEMENTAL EXPERT REPORT OF CHARLES R. MAHLA, PH.D.** |
| HERC Rentals, Inc.; et al., | |
| Defendants. | |

## Introduction

1.     I am a Managing Director and Senior Economist with Econ One, an economic research and consulting firm with offices in Los Angeles, Sacramento, Denver, Houston, Lafayette, Memphis, New York, and Washington D.C.  I have a bachelor's degree in economics from Lafayette College and a doctoral degree in economics from the University of North Carolina at Chapel Hill.  During the nearly 26 years of my professional career, I have worked extensively on the analysis of markets and the assessment of economic damages and their valuation, as well as the assessment of firm value.  In addition, I have performed analyses of losses arising from personal injury, wrongful death, employment discrimination, and wrongful termination.  I have testified as an expert witness in State and Federal Courts.

2.    Econ One is being compensated for the time I spend on this matter at my normal and customary rate of $560 per hour.   Also, Econ One is being compensated for time spent by research staff on this project at their normal and customary hourly rates, ranging from $115 to $235 per hour.

## Assignment

3.    I prepared an initial expert report on this matter on September 30, 2019.[1]  I have been asked by counsel for defendants to supplement this report, and to provide an estimate of Mr. Banda's future prosthetic cost, based on the cost of his current above-knee prosthesis of $55,076.93 each, as opposed to the $100,000 per occurrence contained in Dr. Bubanja's life care plan.[2]  See **Tab 11**.[3]

## Conclusion

4.    As shown on **Tab 3**, Mr. Banda has suffered losses of earnings and benefits as a result of his injury, including past losses of $171,688 and future losses with a present value of $534,347, for a total of $706,034.  Additionally, the cost of Mr. Banda's future care has a present value of $905,070.  Combined, Mr.

---

[1] See Expert Report of Charles R Mahla, PhD, September 30, 2019.
[2] See Capstone Orthopedic, Explanation of Review, Deposition of Jason Schott, CPO, October 4, 2019, Exhibit 4.
[3] This supplemental report only includes copies of the tables that have changed as a result of the updated prosthetic cost.

Banda's total losses of earnings and benefits, plus the cost of his future care, total

$1,611,105.

_____
Charles R. Mahla, Ph.D.
October 15, 2019

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


JAVIER BANDA and ELIDA BANDA,) Case No. 3:18-CV-05329-JCS
                              )
          Plaintiffs,         )
                              )
     vs.                      )
                              )
JOHN DEERE; HERC RENTALS,     )
INC. and DOES 1 through 100   )
inclusive,                    )
                              )
          Defendants.         )
_____)


DEPOSITION OF RICHARD BARNES, CPA


FRIDAY, OCTOBER 18, 2019


SACRAMENTO, CALIFORNIA


Reported by Jacqueline Toliver, CSR No. 4808

Job No. 579955

RICHARD BARNES, CPA - 10/18/2019

Page 16

 1  **Loss calculated through age 65.  Why did you choose to**

 2  **calculate the loss through age 65?**

 3       A.   One, I was asked to assume that that's how

 4  long Mr. Banda intended to work, at least that long.

 5            The other reason would be looking at when he

 6  would be eligible for Medicare to the extent that his

 7  health insurance is tied to his job.

 8            Those would be the primary reasons.

 9            The other point that I would make, consistent

10  with the discussion we were just having, is that through

11  age 65 we're talking about approximately a 20-year time

12  frame from the date of loss.  At 1,450 hours a year on

13  average, that's 29,000 hours.  As I testified, and as

14  the records support, he worked a fair amount more than

15  the 1,450 hours in the year immediately preceding the

16  accident.

17            My calculation would be the same, whether

18  those 29,000 hours over a 20-year period of time

19  resulted in more hours over a shorter period of time.

20  You're going to end up in the same place in terms of the

21  present cash value of the loss.

22       Q.   Okay.  **So if you used a less conservative**

23  **number for the number of hours worked in a year and had**

24  **him stop working at an earlier age, you'd arrive at the**

25  **same place?**

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JAVIER BANDA and ELIDA BANDA,   ) Case No. 3:18-CV-05329-JCS
                             )
            Plaintiffs,   )
                             )
        vs.            )
                             )
JOHN DEERE; HERC RENTALS, INC.,   )
and DOES 1 to 100, inclusive,   )
                             )
          Defendants.   )
                             )

DEPOSITION OF CHARLES MAHLA, PH.D.

October 25, 2019

10:00 a.m.

555 University Avenue, Suite 294

Sacramento, California

REPORTED BY:

Trevor W. McCutchen

CSR No. 13498

1    the last week?

2         A.    Not sitting here.  I certainly could do it, sure.

3         Q.    Okay.  Do you think they'd be -- well, obviously,

4    they'd be closer to Mr. Barnes' numbers; right?

5         A.    Yeah.  I think taking out the prosthetic in terms

6    of the life care plan, I think we're only $30,000 or $40,000

7    different.

8         Q.    Okay.

9         A.    So our discount, you know, the --

10        Q.    I still have to depose you.

11        A.    I understand.  But I don't think that it's worth

12   the -- I don't think the juice is worth the squeeze, but

13   that's fine.

14        Q.    Understood.  Let's talk about the worklife

15   expectancy.

16        A.    Uh-huh.

17        Q.    How do you arrive at 61?

18        A.    Statistical.

19        Q.    Statistical for who?

20        A.    For a -- let's see.  For a Hispanic male, age 45,

21   which is his age at the time of his accident, who's actively

22   employed with less than a high school education.  And there's

23   an important distinction about worklife expectancy that

24   drives the difference between Mr. Barnes and myself.

25        Q.    Sorry.  Hispanic male, actively employed, less than

1    a high school education?

2         A.    Correct.

3         Q.    Thanks.  Okay.  Go ahead.

4         A.    The thing that's important to remember about

5    statistical worklife is that it assumes full time equivalent

6    employment, in this case, for 16.1 years.  The reason you and

7    I have a different worklife expectancy than someone like Mr.

8    Banda is that we're more highly educated.  His 16.1 years

9    might be 18, or 19, or 20 for someone like yourself.  The

10   reason for that is, you're looking at full time equivalent

11   worklife.

12        So what this statistic really does is, it takes out

13   periods of displacement from the work force.  So he may work

14   longer than 61, but there's likely -- statistically, there is

15   a likelihood that he will be displaced, either through

16   injury, reductions in force, economic downturns.  People of

17   lesser education have a much higher probability of being

18   displaced than someone who has more education.

19        Q.    So that likelihood of displacement is based on his

20   education?

21        A.    His education and -- well, in this case, it's also

22   the fact that he's Hispanic.

23        Q.    So, I mean, I have to understand what Hispanic

24   means, and I know that this is a complicated question.  Is

25   Hispanic, in this context, something that relates to his race

1          A.   I don't know.  It would be slightly higher.

2          Q.   And then if you looked at males who earn $80,000 a

3   year, without a high school education, what is their worklife

4   expectancy?

5          A.   I've never seen numbers that break it out that way.

6          Q.   Okay.  Would you expect them to be higher, though?

7          MS. MARTORANO:  Calls for speculation.  Lacks

8   foundation.

9          THE WITNESS:  You know, I don't know.

10  BY MR. OSBORNE:

11         Q.   Okay.

12         A.   I don't know, as I sit here.

13         Q.   That's okay.  Let's talk about the life care plan.

14  So the only difference between your supplemental and your

15  original analysis is the prosthetic; right?

16         A.   Yes.

17         Q.   Do you know why you were told to use a different

18  prosthetic?

19         A.   I believe -- well, I don't know entirely.  I was

20  asked to use it.  I understand that Mr. Shot testified that

21  Mr. Banda is currently using a less expensive prosthetic.

22  And I was given the costs of that prosthetic and asked to

23  assume that Mr. Banda could use that going forward.

24         Q.   Okay.

25         A.   And as you pointed out before, I don't have any

1    opinions about what's the rate of prosthetics.

2         Q.   Understood.  Was Mr. Shot's deposition one of the

3    documents you reviewed?

4         A.   Post my initial report.

5         Q.   All right.  Is Tab 2 -- is there a supplemental to

6    Tab 2?

7         A.   I don't think we did an updated doc review.

8         Q.   That's okay.

9         A.   I think we produced his depo.

10        Q.   I see.  Besides Mr. Shot's depo, was there anything

11   else that you're aware of, as you sit here now, that wasn't

12   listed on Exhibit 6, but was a document that you did review?

13        A.   There might be a document that's now contained in

14   the binder.  And it would be -- let me find it.  There is a

15   small Tab 4 behind large Tab 11 in the binder.

16        Q.   Okay.  Exhibits from Mr. Shot's deposition?

17        A.   Correct.

18        Q.   Okay.

19        A.   This is the document that contains the cost of the

20   prosthetic.

21        Q.   Did you observe any differences between the

22   inflation rates you used for future medical care and the

23   inflation rates that Mr. Barnes used?

24        A.   You know, he doesn't -- he doesn't specifically

25   outline those inflations.  He has net discount rates that he

# EXHIBIT E

# Life and Worklife Expectancies

## Second Edition

## Hugh Richards, M.S.

## Michael Donaldson, Ph.D.

### Contributing Authors

James Ciecka

Peter Ciecka

Frank Slesnick

Robert Thornton

Edward Timmons



**Lawyers & Judges Publishing Company, Inc.**

Tucson, Arizona

154

Life and Worklife Expectancies, Second Edition

**Table 4: Worklife expectancies, increment-decrement methodology, by sex, race, Hispanic origin, and education, July 1999–June 2007: Males All Races**

| Age | All Males * | | | < High School | | | High School or GED | | | Some College | | | Bachelor Degree | | | Graduate Degree | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | All | Act'v | Inact | All | Act'v | Inact | All | Act'v | Inact | All | Act'v | Inact | All | Act'v | Inact | All | Act'v | Inact |
| 18 | 38.6 | 39.3 | 37.9 | 32.4 | 33.0 | 31.9 | 37.9 | 38.3 | 37.0 | 38.9 | 39.6 | 38.1 | | | | | | |
| 19 | 38.2 | 38.7 | 37.3 | 31.9 | 32.5 | 31.2 | 37.3 | 37.6 | 36.3 | 38.5 | 39.0 | 37.5 | | | | | | |
| 20 | 37.7 | 38.2 | 36.6 | 31.5 | 32.0 | 30.5 | 36.6 | 36.9 | 35.5 | 37.9 | 38.5 | 36.9 | 41.9 | 42.4 | 40.0 | | | |
| 21 | 37.1 | 37.5 | 35.9 | 31.0 | 31.4 | 29.7 | 35.8 | 36.1 | 34.6 | 37.4 | 37.9 | 36.3 | 41.2 | 41.6 | 39.7 | | | |
| 22 | 36.5 | 36.8 | 35.2 | 30.4 | 30.8 | 28.9 | 35.1 | 35.3 | 33.7 | 36.8 | 37.2 | 35.7 | 40.5 | 40.7 | 39.2 | | | |
| 23 | 35.8 | 36.1 | 34.4 | 29.7 | 30.1 | 28.1 | 34.3 | 34.6 | 32.7 | 36.2 | 36.5 | 35.0 | 39.7 | 40.0 | 38.4 | 41.1 | 41.5 | 39.6 |
| 24 | 35.1 | 35.3 | 33.6 | 29.1 | 29.3 | 27.3 | 33.6 | 33.8 | 31.8 | 35.5 | 35.7 | 34.2 | 38.9 | 39.1 | 37.5 | 40.6 | 40.8 | 39.3 |
| 25 | 34.3 | 34.5 | 32.7 | 28.3 | 28.6 | 26.6 | 32.8 | 33.0 | 31.0 | 34.7 | 34.9 | 33.4 | 38.1 | 38.3 | 36.7 | 39.8 | 40.0 | 38.7 |
| 26 | 33.5 | 33.6 | 31.9 | 27.6 | 27.9 | 25.7 | 32.0 | 32.2 | 30.2 | 33.9 | 34.0 | 32.6 | 37.3 | 37.4 | 35.8 | 39.0 | 39.1 | 37.8 |
| 27 | 32.6 | 32.8 | 31.0 | 26.8 | 27.1 | 24.7 | 31.2 | 31.3 | 29.4 | 33.0 | 33.2 | 31.6 | 36.4 | 36.5 | 35.0 | 38.0 | 38.1 | 36.8 |
| 28 | 31.8 | 31.9 | 29.9 | 26.0 | 26.4 | 23.6 | 30.3 | 30.5 | 28.4 | 32.1 | 32.3 | 30.5 | 35.4 | 35.5 | 34.0 | 37.1 | 37.2 | 35.7 |
| 29 | 30.9 | 31.1 | 28.9 | 25.2 | 25.6 | 22.6 | 29.5 | 29.7 | 27.4 | 31.3 | 31.4 | 29.5 | 34.5 | 34.6 | 33.1 | 36.2 | 36.3 | 34.6 |
| 30 | 30.0 | 30.2 | 27.9 | 24.4 | 24.8 | 21.8 | 28.6 | 28.8 | 26.4 | 30.4 | 30.5 | 28.5 | 33.6 | 33.6 | 32.1 | 35.2 | 35.3 | 33.8 |
| 31 | 29.1 | 29.3 | 27.0 | 23.6 | 23.9 | 21.1 | 27.8 | 28.0 | 25.5 | 29.5 | 29.6 | 27.5 | 32.6 | 32.7 | 31.2 | 34.3 | 34.4 | 33.0 |
| 32 | 28.3 | 28.4 | 26.1 | 22.8 | 23.2 | 20.3 | 26.9 | 27.1 | 24.6 | 28.6 | 28.7 | 26.5 | 31.7 | 31.8 | 30.2 | 33.4 | 33.4 | 32.1 |
| 33 | 27.4 | 27.5 | 25.1 | 22.0 | 22.4 | 19.5 | 26.1 | 26.3 | 23.7 | 27.7 | 27.8 | 25.6 | 30.8 | 30.8 | 29.3 | 32.4 | 32.4 | 31.2 |
| 34 | 26.5 | 26.6 | 24.2 | 21.2 | 21.6 | 18.6 | 25.2 | 25.4 | 22.8 | 26.8 | 26.9 | 24.6 | 29.8 | 29.9 | 28.3 | 31.4 | 31.5 | 30.2 |
| 35 | 25.6 | 25.8 | 23.2 | 20.4 | 20.8 | 17.7 | 24.3 | 24.5 | 21.8 | 25.9 | 26.0 | 23.7 | 28.9 | 28.9 | 27.4 | 30.5 | 30.5 | 29.2 |
| 36 | 24.7 | 24.9 | 22.2 | 19.6 | 20.0 | 16.8 | 23.4 | 23.7 | 20.8 | 25.0 | 25.1 | 22.8 | 27.9 | 28.0 | 26.3 | 29.5 | 29.6 | 28.1 |
| 37 | 23.8 | 24.0 | 21.1 | 18.7 | 19.2 | 15.8 | 22.6 | 22.8 | 19.8 | 24.1 | 24.2 | 21.8 | 27.0 | 27.0 | 25.2 | 28.6 | 28.6 | 27.0 |
| 38 | 22.9 | 23.1 | 20.1 | 17.9 | 18.5 | 14.8 | 21.7 | 22.0 | 18.9 | 23.2 | 23.3 | 20.8 | 26.0 | 26.1 | 24.2 | 27.6 | 27.7 | 25.9 |
| 39 | 22.0 | 22.3 | 19.1 | 17.1 | 17.8 | 13.8 | 20.9 | 21.1 | 17.9 | 22.3 | 22.4 | 19.8 | 25.1 | 25.2 | 23.1 | 26.7 | 26.7 | 24.8 |
| 40 | 21.1 | 21.4 | 18.0 | 16.4 | 17.1 | 12.8 | 20.0 | 20.3 | 16.9 | 21.4 | 21.6 | 18.7 | 24.2 | 24.2 | 22.1 | 25.7 | 25.8 | 23.8 |
| 41 | 20.3 | 20.5 | 17.0 | 15.6 | 16.4 | 11.9 | 19.1 | 19.5 | 15.9 | 20.5 | 20.7 | 17.7 | 23.2 | 23.3 | 21.2 | 24.8 | 24.8 | 22.9 |
| 42 | 19.4 | 19.7 | 16.0 | 14.8 | 15.7 | 11.1 | 18.3 | 18.7 | 14.9 | 19.6 | 19.8 | 16.6 | 22.3 | 22.4 | 20.2 | 23.8 | 23.9 | 21.9 |
| 43 | 18.5 | 18.9 | 14.9 | 14.1 | 15.1 | 10.3 | 17.5 | 17.9 | 13.8 | 18.7 | 19.0 | 15.6 | 21.4 | 21.5 | 19.2 | 22.9 | 23.0 | 20.9 |
| 44 | 17.7 | 18.0 | 14.0 | 13.4 | 14.4 | 9.5 | 16.6 | 17.1 | 12.9 | 17.8 | 18.1 | 14.6 | 20.5 | 20.6 | 18.1 | 22.0 | 22.0 | 19.8 |
| 45 | 16.8 | 17.2 | 13.1 | 12.7 | 13.7 | 8.9 | 15.8 | 16.3 | 12.0 | 17.0 | 17.3 | 13.6 | 19.5 | 19.6 | 17.1 | 21.0 | 21.1 | 18.5 |
| 46 | 16.0 | 16.4 | 12.1 | 12.0 | 13.1 | 8.2 | 15.0 | 15.5 | 11.1 | 16.1 | 16.4 | 12.6 | 18.6 | 18.7 | 16.2 | 20.1 | 20.2 | 17.3 |
| 47 | 15.1 | 15.6 | 11.2 | 11.3 | 12.5 | 7.6 | 14.2 | 14.7 | 10.2 | 15.2 | 15.6 | 11.6 | 17.7 | 17.8 | 15.1 | 19.2 | 19.3 | 16.2 |
| 48 | 14.3 | 14.8 | 10.3 | 10.6 | 11.8 | 7.0 | 13.4 | 14.0 | 9.4 | 14.4 | 14.8 | 10.7 | 16.8 | 16.9 | 14.0 | 18.2 | 18.3 | 15.2 |
| 49 | 13.5 | 14.0 | 9.4 | 9.9 | 11.2 | 6.3 | 12.6 | 13.2 | 8.6 | 13.6 | 14.0 | 9.7 | 15.9 | 16.1 | 12.9 | 17.3 | 17.4 | 14.1 |
| 50 | 12.7 | 13.2 | 8.6 | 9.3 | 10.6 | 5.6 | 11.8 | 12.5 | 7.8 | 12.7 | 13.2 | 8.8 | 15.0 | 15.2 | 11.7 | 16.4 | 16.5 | 13.0 |
| 51 | 11.9 | 12.5 | 7.7 | 8.6 | 10.0 | 5.1 | 11.0 | 11.7 | 7.0 | 11.9 | 12.5 | 7.9 | 14.1 | 14.3 | 10.5 | 15.5 | 15.7 | 12.0 |
| 52 | 11.1 | 11.7 | 7.0 | 8.0 | 9.4 | 4.6 | 10.3 | 11.0 | 6.3 | 11.1 | 11.8 | 7.2 | 13.2 | 13.5 | 9.4 | 14.6 | 14.8 | 10.9 |
| 53 | 10.3 | 11.0 | 6.2 | 7.4 | 8.8 | 4.1 | 9.5 | 10.4 | 5.7 | 10.4 | 11.0 | 6.4 | 12.3 | 12.7 | 8.5 | 13.7 | 13.9 | 9.7 |
| 54 | 9.5 | 10.3 | 5.6 | 6.8 | 8.3 | 3.7 | 8.8 | 9.7 | 5.1 | 9.6 | 10.3 | 5.8 | 11.4 | 11.9 | 7.7 | 12.8 | 13.1 | 8.8 |
| 55 | 8.7 | 9.6 | 5.0 | 6.2 | 7.8 | 3.2 | 8.0 | 9.0 | 4.5 | 8.8 | 9.6 | 5.2 | 10.6 | 11.1 | 6.8 | 11.9 | 12.2 | 8.0 |
| 56 | 8.0 | 8.9 | 4.4 | 5.6 | 7.3 | 2.8 | 7.3 | 8.4 | 4.0 | 8.1 | 9.0 | 4.6 | 9.8 | 10.3 | 6.0 | 11.0 | 11.4 | 7.2 |
| 57 | 7.3 | 8.3 | 3.9 | 5.1 | 6.7 | 2.5 | 6.7 | 7.7 | 3.6 | 7.4 | 8.3 | 4.1 | 8.9 | 9.6 | 5.2 | 10.1 | 10.6 | 6.4 |
| 58 | 6.6 | 7.6 | 3.4 | 4.5 | 6.2 | 2.2 | 6.0 | 7.1 | 3.1 | 6.7 | 7.7 | 3.6 | 8.1 | 8.9 | 4.5 | 9.3 | 9.9 | 5.7 |
| 59 | 5.9 | 7.0 | 3.0 | 4.1 | 5.6 | 1.9 | 5.3 | 6.5 | 2.8 | 6.1 | 7.1 | 3.2 | 7.3 | 8.2 | 3.9 | 8.5 | 9.2 | 5.1 |
| 60 | 5.2 | 6.4 | 2.6 | 3.5 | 5.1 | 1.7 | 4.7 | 5.9 | 2.4 | 5.4 | 6.6 | 2.8 | 6.6 | 7.6 | 3.4 | 7.6 | 8.5 | 4.4 |
| 61 | 4.6 | 5.9 | 2.3 | 3.1 | 4.7 | 1.5 | 4.1 | 5.4 | 2.2 | 4.8 | 6.1 | 2.5 | 5.8 | 7.0 | 2.9 | 6.8 | 7.8 | 3.9 |
| 62 | 4.0 | 5.5 | 2.0 | 2.7 | 4.4 | 1.3 | 3.6 | 5.0 | 1.9 | 4.3 | 5.7 | 2.2 | 5.1 | 6.5 | 2.6 | 6.1 | 7.2 | 3.4 |
| 63 | 3.5 | 5.1 | 1.8 | 2.3 | 4.1 | 1.2 | 3.1 | 4.7 | 1.7 | 3.7 | 5.3 | 2.0 | 4.5 | 6.0 | 2.2 | 5.4 | 6.7 | 3.0 |
| 64 | 3.0 | 4.8 | 1.6 | 2.0 | 4.0 | 1.1 | 2.7 | 4.4 | 1.5 | 3.3 | 4.9 | 1.8 | 3.9 | 5.6 | 2.0 | 4.8 | 6.1 | 2.6 |
| 65 | 2.6 | 4.5 | 1.4 | 1.8 | 3.8 | 1.0 | 2.3 | 4.2 | 1.4 | 2.9 | 4.6 | 1.6 | 3.4 | 5.2 | 1.7 | 4.2 | 5.7 | 2.3 |
| 66 | 2.3 | 4.2 | 1.3 | 1.6 | 3.7 | 0.9 | 2.1 | 3.9 | 1.2 | 2.5 | 4.3 | 1.5 | 3.0 | 4.8 | 1.5 | 3.7 | 5.3 | 2.0 |
| 67 | 2.0 | 4.0 | 1.1 | 1.4 | 3.6 | 0.8 | 1.8 | 3.7 | 1.1 | 2.2 | 4.0 | 1.3 | 2.6 | 4.5 | 1.3 | 3.2 | 5.0 | 1.7 |
| 68 | 1.8 | 3.8 | 0.9 | 1.2 | 3.4 | 0.6 | 1.6 | 3.6 | 0.9 | 1.9 | 3.9 | 1.1 | 2.2 | 4.2 | 1.1 | 2.8 | 4.7 | 1.5 |
| 69 | 1.5 | 3.6 | 0.8 | 1.0 | 3.2 | 0.5 | 1.4 | 3.4 | 0.8 | 1.6 | 3.7 | 0.9 | 1.9 | 4.0 | 1.0 | 2.4 | 4.4 | 1.2 |
| 70 | 1.3 | 3.4 | 0.7 | 0.9 | 3.0 | 0.5 | 1.2 | 3.3 | 0.6 | 1.4 | 3.6 | 0.7 | 1.7 | 3.7 | 0.8 | 2.1 | 4.1 | 1.0 |
| 71 | 1.1 | 3.2 | 0.5 | 0.8 | 2.9 | 0.4 | 1.0 | 3.1 | 0.5 | 1.2 | 3.4 | 0.6 | 1.4 | 3.5 | 0.7 | 1.8 | 3.7 | 0.9 |
| 72 | 0.9 | 3.1 | 0.4 | 0.6 | 2.7 | 0.3 | 0.9 | 3.1 | 0.4 | 1.0 | 3.2 | 0.5 | 1.2 | 3.3 | 0.6 | 1.5 | 3.5 | 0.7 |
| 73 | 0.8 | 2.9 | 0.4 | 0.5 | 2.6 | 0.3 | 0.7 | 3.0 | 0.3 | 0.9 | 3.0 | 0.4 | 1.1 | 3.1 | 0.5 | 1.3 | 3.2 | 0.6 |
| 74 | 0.7 | 2.8 | 0.3 | 0.5 | 2.6 | 0.2 | 0.6 | 2.9 | 0.2 | 0.7 | 2.8 | 0.3 | 0.9 | 3.0 | 0.4 | 1.1 | 3.0 | 0.5 |
| 75 | 0.6 | 2.7 | 0.2 | 0.4 | 2.5 | 0.2 | 0.5 | 2.7 | 0.2 | 0.6 | 2.6 | 0.3 | 0.8 | 2.8 | 0.3 | 0.9 | 2.8 | 0.3 |

* Calculated from aggregated data, i.e., not weighted averages.

Life and Worklife Expectancies, Second Edition

**Table 4: Worklife expectancies, increment-decrement methodology, by sex, race, Hispanic origin, and education, July 1999–June 2007, continued: Hispanic Males**

| Age | All Hispanic Males * | | | < High School | | | High School | | | Some College or More | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | All | Act'v | Inact | All | Act'v | Inact | All | Act'v | Inact | All | Act'v | Inact |
| 18 | 39.0 | 39.6 | 38.3 | 38.1 | 38.6 | 37.5 | 39.7 | 40.1 | 38.8 | 40.5 | 41.3 | 39.6 |
| 19 | 38.6 | 38.8 | 37.6 | 37.7 | 38.0 | 36.9 | 39.1 | 39.4 | 38.1 | 40.0 | 40.6 | 39.0 |
| 20 | 38.0 | 38.3 | 36.9 | 37.1 | 37.3 | 36.2 | 38.4 | 38.6 | 37.4 | 39.5 | 39.9 | 38.5 |
| 21 | 37.3 | 37.5 | 36.2 | 36.4 | 36.6 | 35.4 | 37.7 | 37.9 | 36.6 | 38.9 | 39.2 | 37.9 |
| 22 | 36.6 | 36.8 | 35.5 | 35.7 | 35.8 | 34.7 | 37.0 | 37.1 | 35.8 | 38.3 | 38.6 | 37.2 |
| 23 | 35.9 | 36.0 | 34.6 | 34.9 | 35.0 | 33.9 | 36.2 | 36.3 | 34.8 | 37.6 | 37.8 | 36.4 |
| 24 | 35.1 | 35.2 | 33.7 | 34.0 | 34.1 | 33.0 | 35.4 | 35.5 | 33.8 | 36.9 | 37.0 | 35.5 |
| 25 | 34.2 | 34.3 | 32.8 | 33.2 | 33.2 | 32.1 | 34.6 | 34.7 | 33.0 | 36.1 | 36.2 | 34.6 |
| 26 | 33.4 | 33.5 | 32.0 | 32.3 | 32.4 | 31.2 | 33.7 | 33.8 | 32.4 | 35.2 | 35.4 | 33.7 |
| 27 | 32.5 | 32.6 | 31.1 | 31.4 | 31.5 | 30.0 | 32.9 | 33.0 | 31.7 | 34.4 | 34.5 | 32.9 |
| 28 | 31.7 | 31.7 | 30.2 | 30.6 | 30.7 | 28.7 | 32.0 | 32.1 | 30.9 | 33.5 | 33.6 | 32.1 |
| 29 | 30.8 | 30.9 | 29.2 | 29.7 | 29.8 | 27.7 | 31.1 | 31.2 | 29.7 | 32.6 | 32.7 | 31.4 |
| 30 | 29.9 | 30.0 | 28.3 | 28.8 | 28.9 | 26.8 | 30.2 | 30.3 | 28.5 | 31.7 | 31.7 | 30.4 |
| 31 | 29.0 | 29.1 | 27.3 | 27.9 | 28.0 | 26.1 | 29.3 | 29.4 | 27.6 | 30.7 | 30.8 | 29.2 |
| 32 | 28.1 | 28.2 | 26.4 | 27.0 | 27.2 | 25.4 | 28.4 | 28.6 | 26.7 | 29.8 | 29.9 | 28.2 |
| 33 | 27.2 | 27.3 | 25.6 | 26.2 | 26.3 | 24.6 | 27.6 | 27.7 | 25.8 | 28.9 | 28.9 | 27.3 |
| 34 | 26.3 | 26.4 | 24.7 | 25.3 | 25.4 | 23.8 | 26.6 | 26.8 | 25.0 | 27.9 | 28.0 | 26.4 |
| 35 | 25.4 | 25.5 | 23.8 | 24.4 | 24.5 | 22.8 | 25.8 | 25.9 | 24.1 | 27.0 | 27.1 | 25.6 |
| 36 | 24.5 | 24.6 | 22.8 | 23.5 | 23.6 | 21.8 | 24.9 | 25.0 | 23.1 | 26.1 | 26.2 | 24.6 |
| 37 | 23.6 | 23.7 | 21.7 | 22.6 | 22.7 | 20.7 | 24.0 | 24.1 | 22.0 | 25.2 | 25.3 | 23.6 |
| 38 | 22.7 | 22.8 | 20.6 | 21.7 | 21.8 | 19.5 | 23.1 | 23.2 | 20.8 | 24.3 | 24.4 | 22.5 |
| 39 | 21.8 | 22.0 | 19.5 | 20.8 | 21.0 | 18.5 | 22.2 | 22.3 | 19.6 | 23.4 | 23.5 | 21.4 |
| 40 | 20.9 | 21.1 | 18.4 | 19.9 | 20.1 | 17.5 | 21.3 | 21.5 | 18.5 | 22.5 | 22.6 | 20.5 |
| 41 | 20.0 | 20.2 | 17.5 | 19.1 | 19.3 | 16.6 | 20.4 | 20.6 | 17.4 | 21.6 | 21.7 | 19.6 |
| 42 | 19.1 | 19.4 | 16.4 | 18.2 | 18.5 | 15.6 | 19.5 | 19.8 | 16.3 | 20.7 | 20.8 | 18.7 |
| 43 | 18.3 | 18.6 | 15.4 | 17.4 | 17.7 | 14.6 | 18.6 | 18.9 | 15.4 | 19.8 | 20.0 | 17.6 |
| 44 | 17.4 | 17.7 | 14.4 | 16.5 | 16.9 | 13.7 | 17.7 | 18.1 | 14.5 | 18.9 | 19.1 | 16.4 |
| 45 | 16.5 | 16.9 | 13.5 | 15.7 | 16.1 | 12.8 | 16.8 | 17.3 | 13.5 | 18.0 | 18.2 | 15.3 |
| 46 | 15.7 | 16.1 | 12.6 | 14.9 | 15.4 | 11.9 | 16.1 | 16.4 | 12.7 | 17.1 | 17.3 | 14.1 |
| 47 | 14.9 | 15.3 | 11.8 | 14.1 | 14.6 | 11.2 | 15.3 | 15.7 | 12.1 | 16.2 | 16.5 | 13.0 |
| 48 | 14.0 | 14.5 | 11.0 | 13.2 | 13.7 | 10.4 | 14.5 | 14.9 | 11.3 | 15.3 | 15.6 | 12.0 |
| 49 | 13.2 | 13.7 | 10.1 | 12.4 | 12.9 | 9.5 | 13.8 | 14.2 | 10.5 | 14.4 | 14.8 | 11.0 |
| 50 | 12.4 | 12.9 | 9.1 | 11.6 | 12.1 | 8.7 | 13.0 | 13.5 | 9.7 | 13.6 | 14.0 | 9.8 |
| 51 | 11.6 | 12.1 | 8.2 | 10.7 | 11.4 | 7.8 | 12.3 | 12.8 | 8.9 | 12.7 | 13.2 | 8.8 |
| 52 | 10.8 | 11.4 | 7.3 | 10.0 | 10.7 | 7.0 | 11.5 | 12.1 | 7.9 | 11.8 | 12.4 | 7.7 |
| 53 | 9.9 | 10.7 | 6.4 | 9.1 | 10.0 | 6.2 | 10.6 | 11.5 | 7.0 | 10.9 | 11.7 | 6.8 |
| 54 | 9.2 | 10.1 | 5.7 | 8.5 | 9.4 | 5.4 | 10.0 | 10.8 | 6.1 | 10.2 | 10.9 | 6.1 |
| 55 | 8.5 | 9.4 | 5.0 | 7.8 | 8.8 | 4.7 | 9.2 | 10.1 | 5.4 | 9.4 | 10.1 | 5.5 |
| 56 | 7.8 | 8.7 | 4.4 | 7.2 | 8.3 | 4.1 | 8.5 | 9.4 | 4.7 | 8.7 | 9.4 | 4.9 |
| 57 | 7.1 | 8.0 | 3.9 | 6.5 | 7.6 | 3.6 | 7.8 | 8.7 | 4.2 | 7.9 | 8.7 | 4.4 |
| 58 | 6.3 | 7.4 | 3.4 | 5.7 | 7.0 | 3.1 | 7.0 | 8.0 | 3.8 | 7.2 | 8.0 | 4.1 |
| 59 | 5.7 | 6.7 | 3.1 | 5.2 | 6.3 | 2.8 | 6.3 | 7.4 | 3.4 | 6.5 | 7.3 | 3.7 |
| 60 | 5.0 | 6.1 | 2.7 | 4.6 | 5.7 | 2.4 | 5.5 | 6.8 | 3.0 | 5.9 | 6.7 | 3.4 |
| 61 | 4.5 | 5.6 | 2.4 | 4.1 | 5.3 | 2.1 | 4.8 | 6.2 | 2.6 | 5.3 | 6.2 | 3.1 |
| 62 | 3.8 | 5.1 | 2.1 | 3.5 | 4.9 | 1.8 | 4.1 | 5.7 | 2.3 | 4.7 | 5.7 | 2.8 |
| 63 | 3.2 | 4.8 | 1.8 | 2.9 | 4.6 | 1.5 | 3.6 | 5.2 | 2.2 | 4.2 | 5.3 | 2.5 |
| 64 | 3.0 | 4.5 | 1.6 | 2.6 | 4.4 | 1.3 | 3.2 | 4.8 | 2.0 | 3.8 | 5.0 | 2.2 |
| 65 | 2.6 | 4.3 | 1.4 | 2.3 | 4.3 | 1.1 | 2.8 | 4.4 | 1.8 | 3.4 | 4.9 | 1.9 |
| 66 | 2.3 | 4.1 | 1.3 | 1.9 | 4.0 | 0.9 | 2.5 | 4.2 | 1.6 | 3.1 | 4.8 | 1.7 |
| 67 | 1.9 | 4.0 | 1.0 | 1.6 | 3.8 | 0.8 | 2.2 | 3.9 | 1.4 | 2.7 | 4.7 | 1.4 |
| 68 | 1.7 | 4.0 | 0.9 | 1.3 | 3.7 | 0.6 | 1.9 | 3.7 | 1.2 | 2.4 | 4.6 | 1.2 |
| 69 | 1.4 | 3.8 | 0.7 | 1.1 | 3.5 | 0.5 | 1.7 | 3.5 | 1.0 | 2.1 | 4.5 | 0.9 |
| 70 | 1.2 | 3.6 | 0.5 | 0.9 | 3.2 | 0.4 | 1.4 | 3.4 | 0.8 | 1.9 | 4.4 | 0.7 |
| 71 | 0.9 | 3.3 | 0.3 | 0.7 | 3.0 | 0.3 | 1.2 | 3.5 | 0.6 | 1.6 | 4.4 | 0.5 |
| 72 | 0.7 | 3.1 | 0.2 | 0.5 | 2.8 | 0.2 | 0.9 | 3.6 | 0.4 | 1.3 | 4.3 | 0.4 |
| 73 | 0.5 | 2.9 | 0.2 | 0.4 | 2.6 | 0.2 | 0.8 | 3.8 | 0.3 | 1.2 | 4.2 | 0.2 |
| 74 | 0.5 | 2.9 | 0.1 | 0.3 | 2.3 | 0.1 | 0.6 | 3.8 | 0.1 | 1.0 | 4.0 | 0.1 |
| 75 | 0.4 | 2.8 | 0.1 | 0.3 | 2.1 | 0.1 | 0.6 | 3.5 | 0.1 | 0.8 | 3.6 | 0.1 |

* Calculated from aggregated data, i.e., not weighted averages.

# EXHIBIT F

# LIFE CARE PLAN

# FOR

# JAVIER BANDA

# SEPTEMBER 9, 2019

Prepared by Dr. Diana Bubanja DPT CLCP CFCE CEAS
Center for Career Evaluations, Inc.
3100 Oak Rd. Suite 390
Walnut Creek, CA 94597

**JAVIER BANDA**
**PRELIMINARY LIFE CARE PLAN: 9/9/19**
**PROSTHETICS**

| Item or Service | Duration | Frequency | Purpose | Estimated Cost/ Cost Obtained From | Recommended By |
|---|---|---|---|---|---|
| Right Above-Knee (AK) Prosthesis | Lifetime | 1x/3-4 yrs. | Independent ambulation. | $100,000/ea. $25,000-33,333/yr. ($29,167/avg) Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| AK Vertical Shock Foot Prosthesis | Lifetime | 1x/3-4 yrs. | Independent ambulation. | $10,960/ea. $2,740-3,653/yr. ($3,197/avg) Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| AK Prosthesis Socket Replacement | Lifetime | 1x/3 yrs. | Ensure proper prosthesis fit. Socket changes required due to alterations in anatomy and stump size. | $6,325/ea. $2,108/yr. Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| AK Gel Liners | Lifetime | 4 liners/yr. | Protect stump; provide proper prosthesis fit. | $911/ea. $3,644/yr. Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| AK Multi-Ply Socks | Lifetime | 24 socks/yr. | Protect stump; prevent skin breakdown. | $38.83/ea. $932/yr. Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| AK Single-Ply Socks | Lifetime | 24 socks/yr. | Protect stump; prevent skin breakdown. | $14.82/ea. $356/yr. Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| AK Sheath | Lifetime | 24 sheaths/yr. | Protect stump; prevent skin breakdown. | $37.78/ea. $907/yr. Advanced Prosthetics | John Edwards, M.D. Jason Schott, CPO |
| *All prosthetics have a three-year warranty. | | | | | |

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHEASTERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-oOo-

JAVIER BANDA, and ELIDA          Case No: 3:18-CV-05329-JCS
BANDA,


            Plaintiff,

vs.

JOHN DEERE; HERC RENTALS, INC,
and DOES 1 through 100,
inclusive,


            Defendants.
_____


DEPOSITION OF JASON SCHOTT, CPO

October 4, 2019

-oOo-

1247 E. Alluvial Avenue, Suite 103

Fresno, California


REPORTED BY:

Liliana Rodriguez

CSR No. 13783

1    Q.  Okay.  That's helpful.  Thank you.

2         I think that's enough on that front.  Let's turn

3   now to your treatment of Mr. Banda.

4         When did Mr. Banda become your patient?

5    A.  I'm going to open his chart if that is okay.

6    Q.  Okay.  And just for the record, you have a laptop

7   with you, and so I assume you have an electronic version

8   of his chart on your laptop there.

9    A.  Yes, that is correct.

10   Q.  Great.

11   A.  My file shows that his first visit for an initial

12   consultation was November 15, 2017.

13   Q.  Okay.  And do you know how he was referred to

14   you?

15   A.  Would you like a definitive answer or do you want

16   me to answer from what I believe is how he was referred?

17   Q.  How do you believe he was referred?

18   A.  I believe he was referred from his work comp

19   carrier.

20   Q.  Is that a common way for patients to be referred

21   to you, through a workers' compensation proceeding?

22   A.  Yes.

23   Q.  And you still continue to treat him?

24   A.  Yes.

25   Q.  Roughly how often do you see Mr. Banda?

1       A.  We had been seeing him because he was a new

2   amputee.  It's pretty common to see those folks on a

3   weekly or I'd say every-other-week basis.  Now he is on

4   a probably three month follow-up basis.

5       Q.  And does he have an upcoming appointment

6   scheduled with you?

7       A.  He may.  This system -- we have changed the

8   system in my Visalia office, so I'd have to log in to

9   another system.  If you'd like I can get that answer.  I

10  just need to do some digging.

11      Q.  That's fine.

12          It's your understanding that he's an ongoing

13  patient and you expect to continue to see him?

14      A.  Yes.  I wouldn't expect him to go longer than

15  about three months before I am able to see him and

16  evaluate his fitting needs again.

17      Q.  Do you know when you last saw him?

18      A.  Let me log in to my Visalia office's system.

19  They use a different MMR platform there.  He was last

20  seen on July 11, 2019, for repairs and maintenance to

21  his prosthesis.

22      Q.  Okay.

23      A.  He has another follow-up on October 17, and

24  that's just a scheduled standard follow-up.  So that

25  kind of falls within that three-month period.

1        Go ahead.

2        THE WITNESS:  Yeah, I can't speak to that.  But I

3   wouldn't see why there would be a problem with working

4   to some degree.

5   BY MS. MARTORANO:

6        Q.  Okay.  I wanted to talk to you a little bit about

7   his future needs for equipment.  So as of now he has a

8   prosthesis, of course.  Is that the first one or has

9   there been a replacement prosthesis so far?

10       A.  He is on his initial prosthetic.  He was fitted

11   with a fairly advanced initial prosthetic.  It has a

12   microprocessor-controlled knee.  He has a hydraulic

13   ankle that helps him to be able to walk or transverse

14   over uneven surfaces, and he's fitted with a suction

15   socket.  Actually, you know what?  I'm sorry, he does

16   not have a hydraulic ankle.  He has a vertical shock

17   foot system, I'm sorry.

18       Q.  When did he first start using that prosthetic?

19       A.  He was fitted with his first above-knee

20   prosthetic on December 27, 2017.

21       Q.  Okay.

22       A.  And generally his knee itself will have a

23   three-year manufacturers life span on it where they

24   service it and warranty it through that period of time.

25   So we're coming up on two years on that and same on his

1    his first socket that he had that I referenced was

2    fitted in December of 2017.

3        Q.   Okay.  So this would be the first prosthetic he

4    was fitted with?

5        A.   Yes.

6        Q.   And you were the prosthetist who was involved in

7    that?

8        A.   That is correct.

9        Q.   And so Exhibit Number 4 is a correlating document

10   that lists the various parts and items that were

11   involved at that time.  Do you see that --

12       A.   I do.

13       Q.   -- that correlates?  Okay.  And so going back to

14   Exhibit 3 on page 5 of the exhibit.  Do you see where

15   there's a total charge of $55,076.93?

16       A.   On page what?

17       Q.   Bottom of page 5.

18       A.   Yes.

19       Q.   Okay.  And so does that mean that the cost of

20   that first prosthetic he got was $55,076.93?

21       A.   Yes, that was the charged amount but not the

22   contract-allowed amount.

23       Q.   And so the contract-allowed amount, I believe we

24   find that if you look at Exhibit 4 on page 4 where it

25   shows the total charge and then it shows the allowed

1    amount.  And that would be $40,971.07, correct?

2      A.  That appears to be accurate.

3      Q.  And so does that include the foot and the knee

4    and everything you just described as far as that first

5    prosthetic?

6      A.  Yes, that is for his first microprocessor, that

7    Plié and that foot that we described.

8      Q.  Okay.  And the next time he requires a new

9    prosthetic, would your estimate be that it would cost

10   around the same amount?

11     A.  That would depend.  There is some variability

12   there.  I believe he has the potential to use a

13   higher-end prosthetic knee, and I would do a trial with

14   him.  That knee does have a substantially higher cost to

15   just the knee itself.  Let me look up and find out what

16   that is, if I could do that real quick.

17          MR. OSBORNE:  I'll just state a belated objection

18   to form.

19          THE WITNESS:  Just the knee itself if he was to

20   qualify for the Ottobock X3 knee is generally about

21   $75,000 for that knee.

22   BY MS. MARTORANO:

23     Q.  Okay.  And so just the knee, what is the

24   difference between the current knee and that Ottobock

25   knee you just described?

```
 1        A.   The Ottobock knee is the advanced knee, the X3
 2   and it has a five-day battery life.  So he wouldn't be
 3   obligated to charge the knee if he went somewhere off
 4   the grid or visited someone outside of where they have
 5   power.  He would be able to have full power to his knee
 6   for up to five days.  It has full waterproof features.
 7        Q.   And why would he need waterproof features?
 8        A.   He had expressed an interest at one time, like I
 9   said, of returning to work, and if he were to return to
10   any type of work he would have to have that type of a
11   knee to be able to transverse stairs or steps, step over
12   step, that knee would allow that.  It would also allow
13   him to take step over step down stairs.  It has a
14   significant amount of increased safety features
15   throughout the knee as far as adapting in real time to
16   help him not fall and not take a misstep.  It's just a
17   lot more sophisticated of a device.
18        Q.   And so what is the cost of the current knee he's
19   using, just the knee?
20        A.   Let me --
21             MR. OSBORNE:  Objection to form.
22             THE WITNESS:  If I take my phone out and use it
23   as a calculator is that okay?
24   MS. MARTORANO:
25        Q.   You are welcome to do that.  Sure.
```

1      A.   Thank you.   From what my quick math says it's

2   about $22,329.55.

3      Q.   So assuming for a minute that he upgraded to a

4   prosthetic with the Ottobock knee you just described, in

5   that case what is your estimate of what the total cost

6   of that prosthetic would be?

7           MR. OSBORNE:   Same objection.

8           THE WITNESS:   I can roughly -- it would be that

9   75,000 plus -- bear with me one quick second.   It would

10  be that 75,000 plus approximately 19,000 for the

11  socket -- and this is gross billing -- socket and

12  supplies, plus the foot, and the foot would cost

13  approximately say $4,000 for the foot.

14  BY MS. MARTORANO:

15     Q.   So roughly $100,000?

16     A.   Roughly.

17     Q.   Okay.

18     A.   I'm sorry, that was -- it's 5,800 for the foot, I

19  missed one code, I missed the shock code.

20     Q.   Okay.   5,800, okay.   Just to get a sense of it.

21  Thank you.

22     A.   And the biggest reason I switch the patients to

23  those is there is a significant documentation of less

24  falls from my active patients.

25          MR. POHLE:   From what device to what device, I'm

1    true?

2         MR. OSBORNE:  Objection to form.

3         THE WITNESS:  It was not.  And the document does

4    look a little familiar, I have to be honest.  I may have

5    reviewed this.  I just I can't speak for certainty.

6    I'm sorry, I wish I could say I wasn't super busy some

7    days.

8    BY MS. MARTORANO:

9         Q.  Understood.  If you could please go now to page 9

10   it's entitled "Prosthetics."  Are you at page 9?

11        A.  I am.

12        Q.  And so that also refers to -- in the "recommended

13   by" it refers to Dr. John Edwards and also to you, Jason

14   Schott; you see that there?

15        A.  I do.

16        Q.  And then there's various items on the left-hand

17   column related to prosthetics, correct?

18        A.  That is correct.

19        Q.  So just starting with the first item, the right

20   above-knee prosthesis.  Do you see that there?

21        A.  I do.

22        Q.  Okay.  And now that refers to an estimated cost

23   of $100,000 each; do you see that?

24        A.  I do.

25        Q.  And so do you have any understanding of what that

```
 1   exactly refers to?  Is that the prosthetic we discussed

 2   earlier that would include the Ottobock knee?

 3          MR. OSBORNE:  Objection to form.

 4          THE WITNESS:  It does.  It is specific to the

 5   Ottobock X3 knee, a vertical shock foot and the type of

 6   socket that Mr. Banda currently uses as well as a vacuum

 7   suspension system.

 8   BY MS. MARTORANO:

 9     Q.  And so the first item, the above-knee prosthesis

10   with the Ottobock knee, that is not what he's currently

11   using, correct?

12     A.  That is correct.

13     Q.  The second item, the vertical shock foot, is that

14   what he's currently using?

15     A.  That is what he's currently using.  That amount

16   may have been quoted a little high.  And I may have

17   misquoted that to her.

18     Q.  What do you believe is a more accurate quote for

19   the vertical shock foot?

20          MR. OSBORNE:  Objection to form.

21          THE WITNESS:  I would say around the $7,000

22   range.

23   BY MS. MARTORANO:

24     Q.  Okay.  And then the prosthesis socket replacement

25   at $6,325 each, do you know what that refers to?
```

1    how we arrived at that.

2       Q.   That being the Freedom Innovation Knee he

3    currently uses?

4       A.   That is correct.

5       Q.   What percentage of your above-knee amputee

6    patients use the Freedom Innovation microprocessor knee

7    that Mr. Banda uses?

8       A.   So we have to -- we need to define that question

9    a little more.

10      Q.   How --

11      A.   Of all of the microprocessor amputees that I have

12   or of all the patients who have amputations, period?

13      Q.   Why don't you answer both.  Start with the former

14   and go with the latter.

15      A.   Okay.  So I would say that - and these are

16   insurance challenges that kind of pigeonhole us into

17   putting mechanical knees on many patients.  Medicare and

18   a lot of private insurances have stipulation where they

19   will not pay for microprocessor knees for prosthetics on

20   initial amputees.  And they make it very challenging to

21   be able to establish a criteria for those folks to

22   actually have those knees paid for.  So I would say

23   probably half of the patients that we have -- I would

24   say a third of the patients that are - use mechanical

25   knees.

 1          I would say two-thirds of the rest of the

 2    patients use some form of microprocessor knees.  I would

 3    say of my practice -- and this is specific to my

 4    practice only -- probably 70 to 80 percent of those --

 5    yeah, maybe make that 60 to 70 percent of those patients

 6    use -- I'm sorry, you're typing and I'm retracting my

 7    statements.  I'm thinking in real time.  Of all the

 8    microprocessors that I fit I would say 50 to 60 percent

 9    use the Plié.  And I would say 30 percent use a variety

10    of similar type knees to the Plié.  And I probably have

11    10 percent that use that X3, that knee we spoke of

12    earlier.

13        Q.  The Plié knee that Mr. Banda uses, does that come

14    with a three-year warranty?

15        A.  It does.  It's a 36-month warranty.  The

16    manufacturer provides a service unit.  They generally

17    will overnight that unit if his unit were to go down.

18    And then they provide warranty service for that.

19          The other reason -- I was thinking more about why

20    I chose the Plié for him.  He had originally thought he

21    was going to be working around some type of water,

22    things like that.  The Plié does have some more water

23    resistant properties than some of the other knees do in

24    its same category, so that was the other reason we chose

25    that direction.

1    BY MR. POHLE:

2        Q.   How many of your patients have you tried out the

3    X3 knee and you determine that, you know what, this

4    person isn't the best candidate for this knee?

5        A.   None.

6        Q.   So the seven to eight patients you've had that

7    have used the X3 knee, all of them have gone through the

8    trial period, all of them you've made the

9    recommendation, yes, they should use the X3 knee?

10       A.   A lot of it is I have been in agreement with the

11   patient, and that we, the patient and I, both agree that

12   it's a better knee for their gait.  But on all of those

13   cases I have -- I have had input that their gait has

14   improved, their cadence has improved, the level of

15   efficiency, the compensatory movements, meaning, how

16   much they move their hip, how much vaulting they do on

17   the other side.  I've seen global reductions on all of

18   those and basically increased efficiency in their gait.

19       Q.   Have you mentioned to Mr. Banda the possibility

20   of using an X3 knee?

21       A.   I believe we talked about it in the early phases

22   of his fitting and it was more of in generalities that

23   there are knees that are better that are out on the

24   market.  But I'm going to fit you with something that is

25   what I feel is going to be appropriate for you for the

1    initial phases.  It's a very good knee.  I have many

2    people that use them.

3         So I think we kind of spoke to it as there is

4    potential down the road based on how well he did.

5       Q.  Since you initially apprised Mr. Banda about more

6    sophisticated knees, has he followed up with you and

7    asked about them?

8       A.  I can't recall.

9       Q.  Is there a more sophisticated microprocessor knee

10   on the market than the X3?

11          MR. OSBORNE:  Vague as to form.

12          THE WITNESS:  There are some other varieties out

13   there.  There are some power knee options that are true

14   bionic knees that do extend and move like more bionics.

15   The X3 knee is still for the most part a passive knee.

16   I believe it does have some active extension resistance

17   but it doesn't mechanically straighten like you would

18   quote on quote see a bionic knee straighten or move or

19   bend.  There are knees out there that do that.  I don't

20   have experience using them.

21          I have seen them in my office in trials.  I have

22   not found a patient that I thought would improve their

23   quality of life to move forward with those.

24   BY MR. POHLE:

25      Q.  Is the X3 knee the most sophisticated knee that

# EXHIBIT H



SEP 1 3 2019

September 10, 2019


Kevin Osborne, Esq.
Arns Law Firm
515 Folsom St., 3rd Floor
San Francisco, CA 94105

**RE:  Javier Banda**


Dear Mr. Osborne,

The following Vocational Consultation Report is regarding Mr. Javier Banda.  This report is based on information available to date.  In the event additional information becomes available in the future, I reserve the right to modify my opinions.

Mr. Banda was referred to the Center for Career Evaluations, Inc. in August 2019. The goal of the referral was to assess Mr. Banda's vocational and wage earning potential while considering his injuries on 8/22/17, together with his work history, education, skills, and labor market conditions.  Prior to submission of this report, I reviewed the records outlined below.  Mr. Banda participated in an interview and vocational testing at this office on 8/9/19.  I discussed Mr. Banda's medical status with his treating physician, John Edwards, M.D.  I also reviewed Tulare County labor market data.

**Qualifications**

My educational background includes a bachelor's degree in Spanish from U.C. Berkeley and a master's degree in Rehabilitation Counseling from San Francisco State University.  I am a Certified Rehabilitation Counselor, a Certified Life Care Planner, and am certified as a Diplomate with the American Board of Vocational Experts.  Since 1991, my professional experience includes positions as a vocational rehabilitation counselor with injured workers, as well as work as a vocational consultant evaluating employability and earning capacity of individuals with physical, cognitive, and/or emotional disabilities. Currently, I am a vocational consultant/principal with the Center for Career Evaluations.

RE:  JAVIER BANDA

## Records Reviewed

Legend underlined: <u>Legal</u>                                      <u>Employment/Wage</u>

Complaint                                       Vulcan Construction & Maintenance
Discovery Responses
Deposition (Javier Banda)

<u>Medical</u>

John Edwards, M.D.
Matthew Epstein, M.D.
Scott Graham, M.D.
Christopher Lee, M.D.

If you have any questions regarding this report, please feel free to call for clarification.

Sincerely,

Maria Brady, MS, CRC
Vocational Consultant

Encl:  CV
          Summary of Testimony

RE: JAVIER BANDA

## VOCATIONAL CONSULTATION REPORT

| PERSONAL BACKGROUND |
| --- |

Mr. Javier Banda is a 47-year-old male (DOB: 5/12/72), who has lived with his wife in Orosi, CA for over 20 years. Their two youngest children, ages 16 and 15, live at home. Their 24-year-old daughter lives with her husband and his family.

During his vocational evaluation, Mr. Banda was observed to walk with an uneven gait with the aid of a right leg prosthesis. He interacted in a serious manner. Facial scarring was noticeable. He was accompanied by his brother and son, who were not present during the evaluation.

Mr. Banda stated that he possesses a Class C California driver's license and has a clean driving record. He has no history of felony conviction. He has never served in the military.

He grew up in Ixtlan del Rio, Nayarit, Mexico, where he completed six years of elementary school. He noted that his literacy in Spanish is limited. Mr. Banda indicated that he left school in order to work and because his reading skills were poor. He immigrated to the U.S. at age 19. Mr. Banda indicated that he is monolingual in Spanish. He has not studied English as a Second Language.

In terms of personal hobbies, Mr. Banda reported that pre-injury, he enjoyed dancing, taking trips with his family, and helping his brothers with construction projects. Post-injury, he is unable to do these things, and instead, listens to music.

| EMPLOYMENT HISTORY |
| --- |

| | |
| --- | --- |
| Job Title: | Laborer |
| Employer: | Vulcan Construction & Maintenance, Inc., Fresno, CA |
| Dates: | Approx. 2002 or 2003 to 8/22/17 |
| Wages: | $32.17/hr. |
| Benefits: | Through the Laborers' union, Local 294 - medical, dental, retirement |
| Hours: | 40 hours/week (Monday-Thursday, 10 hours/day) |
| Duties: | Repairing gas and water pipelines, installed pipes, patched sidewalks, excavating duties using shovels, forklift operation, use of jackhammers. |
| Physical Demands: | Standing, walking, heavy lifting, repetitive bending, use of hands, climbing ladders. |
| Reason for Leaving: | Injuries |

RE:  JAVIER BANDA

| | |
|---|---|
| Job Title: | Farm Worker |
| Employer: | Did not recall, near Cutler, CA |
| Dates: | 4 years |
| Wages: | Variable, by contract or hourly |
| Benefits: | n/a |
| Hours: | Full-time |
| Duties: | Picked grapes |
| Physical Demands: | Lifting/carrying 15-18 lbs.  Standing, walking. |
| Reason for Leaving: | Better job |

| | |
|---|---|
| Job Title: | Farm Worker |
| Employer: | Wileman Brothers, Cutler, CA |
| Dates: | 1 to 1 ½ years |
| Wages: | Did not recall |
| Benefits: | n/a |
| Hours: | Full-time |
| Duties: | Packing and picking peaches, nectarines, cherries, and oranges. |
| Physical Demands: | Lifting/carrying 25-30 lbs.  Standing, walking. |
| Reason for Leaving: | Better job |

| | |
|---|---|
| Job Title: | Farm Worker (Pig Farm) |
| Employer: | Did not recall, Yettem, CA |
| Dates: | Approximately 1991-97 |
| Wages: | Minimum wage |
| Benefits: | n/a |
| Hours: | Full-time |
| Duties: | Fed pigs, gave injections, clipped tails, tended silos of feed. |
| Physical Demands: | Walking, bending, use of hands, lifting up to 15 lbs. |
| Reason for Leaving: | Company closed |

Between the ages of 13-19, Mr. Banda was a residential construction worker in Mexico. He was a shoeshine boy as a child.

## TRANSFERABLE SKILLS ANALYSIS

Mechanical/Building Trades Experience:  Laborer (14-15 years)

Business Experience

| | |
|---|---|
| Supervision: | n/a |
| Management: | n/a |
| Accounting/ bookkeeping: | n/a |
| Sales: | n/a |

4

RE:  JAVIER BANDA

| | |
|---|---|
| Service Writing: | n/a |
| Report Writing: | n/a |

<u>Clerical Experience</u>

| | |
|---|---|
| Computer Knowledge: | No experience with computers.  Accesses the internet on his phone; does not use e-mail. |
| Typing/Speed: | n/a |
| Business Machines: | n/a |
| Ordering/Purchasing:  n/a | |
| Dispatching: | n/a |
| Reception: | n/a |
| Filing: | n/a |

<u>Service Experience</u>

| | |
|---|---|
| Teaching: | n/a |
| Social services: | n/a |

<u>Arts Experience</u>        n/a

<u>Consumer Economics</u>     n/a

<u>Science/Medical</u>        n/a

---

## PHYSICAL CONDITION

Mr. Banda sustained an above-knee amputation of his right leg in the incident on 8/22/17.  He also sustained a right orbital wall fracture, facial lacerations, loosening of two teeth, and a severe tear of his right nostril.

He is treated by Dr. Edwards, and has appointments with him every 1-2 months.  Mr. Banda also sees a prosthetist, Jason Schott, CPO, approximately every 2 months.

In terms of pain, Mr. Banda has throbbing stump pain in his right leg when he removes the prosthesis.  He described this discomfort as level 3-4 on a scale of 0 to 10.

He does not have any history of previous injuries causing ongoing difficulty.

Mr. Banda takes the following medications as prescribed by Dr. Edwards:

Nortriptyline 10 mg, for pain, two at night, causes sleepiness.
Systane eyedrops, to lubricate right eye

The following subjective physical tolerances were reported:

RE: JAVIER BANDA

He indicated that he is able to stand in a fixed position for about 15-30 minutes at a time. Similarly, he can sit for 15-30 minutes at a time. He noted that he can walk for up to 7-10 minutes. Mr. Banda no longer uses a cane or crutches. He has an electric scooter that he uses when going to his mailbox.

He described no limitations with bending or reaching. He is unable to squat, crawl, or kneel. His ability to climb stairs is limited.

Mr. Banda estimated that he can lift up to 10-15 lbs. He stated that he is unable to carry anything as he has to concentrate on walking.

He described limitations with pushing and pulling. Mr. Banda is left-hand dominant. He reported no limitations with use of his hands or fingers.

In terms of driving, Mr. Banda indicated that his Toyota Tacoma pickup truck has been modified as a result of his disability. The vehicle modifications allow him to drive using his left foot. He noted that driving requires more focus and planning as he is so accustomed to using his right foot. Mr. Banda stated that he typically only drives locally, and experiences discomfort with longer distances. He described difficulty climbing into and out of his truck.

He reported no issues with his vision.

He denied any problems with sleep.

## COGNITIVE/BEHAVIORAL ISSUES

Mr. Banda stated that post-injury, he has not noticed issues with memory or with his ability to concentrate. He indicated that he does not experience feelings of depression or anxiety.

## VOCATIONAL TESTING RESULTS

### CAREER ABILITY PLACEMENT SURVEY (CAPS-Spanish Edition)

| Subject | Stanine | Subject | Stanine |
|---|---|---|---|
| Mechanical Reasoning | 3 | Language Usage | 1 |
| Spatial Relations | 4 | Word Knowledge | 1 |
| Verbal Reasoning | 1 | Perceptual Speed/Accuracy | 1 |
| Numerical Ability | 2 | Manual Speed/Dexterity | 2 |

6

RE:  JAVIER BANDA

| Subject | Result | Norms |
|---|---|---|
| Test of Adult Basic Education (Reading Comprehension) | Below 1st  grade | Grade level equivalent |
| BETA 4 – General Reasoning | 3rd percentile | General population by age |
| Purdue Finger Dexterity Test | 4th percentile | Applicants for production work |
| Dvorine Color Discrimination | Normal | |

According to the Career Abilities Placement Survey (CAPS-Spanish edition), a vocational aptitude test battery, Mr. Banda's Spatial Relations score was in the average range.  He scored below average for the other 7 aptitude subtests.

His non-verbal reasoning was low, suggesting that he would perform best learning new skills on the job, rather than in a formal educational setting.  His bimanual finger dexterity was low on the Purdue Pegboard Test.  He possesses normal color vision per the Dvorine Color Discrimination Test.

Mr. Banda's reading comprehension score in English is consistent with his limited educational background.

## WORKER CHARACTERISTICS

Mr. Banda arrived punctually to participate in a vocational evaluation on 8/9/19.  He was casually dressed and presented in a cooperative manner.  Vocational testing was conducted from 11:46 a.m. until 2:56 p.m., and was followed by an interview from 3:00 - 3:57 p.m.  He declined extended breaks, but took a 5-minute restroom and stretch break at 12:55 p.m.  He took a 7-minute break at 2:01 p.m., and stood up.  Mr. Banda stood again during a 2-minute break at 2:44 p.m.

While alternating between standing and sitting, Mr. Banda exhibited the ability to maintain a regular work station during the vocational evaluation.

## VOCATIONAL INTEREST RESULTS

According to the Reading-Free Vocational Interest Inventory, Mr. Banda's highest areas of interest were for the occupational categories of Building Trades, Food Service, Horticulture, and Housekeeping.

Mr. Banda stated that he would like to work in some capacity, but is unsure what he may be able to do.  He expressed concern that he needs to change position frequently, and can only do light physical activities for 5-10 minutes before needing to rest for about 15 minutes in order to resume activity for another brief period.

7

RE: JAVIER BANDA

## PRE-INCIDENT VOCATIONAL ANALYSIS

Pre-incident, Mr. Banda worked as a union laborer. Per the U.S. Department of Labor's *Dictionary of Occupational Titles*, such work is classified as follows:

CODE: 869.687-026
TITLE(s): CONSTRUCTION WORKER II (construction)

Performs any combination of following tasks, such as erecting, repairing, and wrecking buildings and bridges; installing waterworks, locks, and dams; grading and maintaining railroad right-of-ways and laying ties and rails; and widening, deepening, and improving rivers, canals, and harbors, requiring little or no independent judgment: Digs, spreads, and levels dirt and gravel, using pick and shovel. Lifts, carries, and holds building materials, tools, and supplies. Cleans tools, equipment, materials, and work areas. Mixes, pours, and spreads concrete, asphalt, gravel, and other materials, using handtools. Joins, wraps, and seals sections of pipe. Performs variety of routine, nonmachine tasks, such as removing forms from set concrete, filling expansion joints with asphalt, placing culvert sections in trench, assembling sections of dredge pipeline, removing wallpaper, and laying railroad track. Many of these jobs are not full time; project size and organization of work determine whether workers spend their time on one job or transfer from task to task as project progresses to completion. Some workers habitually work in one branch of industry, whereas others transfer according to availability of work or on seasonal basis. Work is usually performed with other workers. May be designated according to specific work performed as Air-Hammer Operator (construction); Asphalt-Plant Worker (construction); Asphalt Raker (construction); Backer-Up (construction); Bell-Hole Digger (construction); Brick Cleaner (construction). May be designated: Bricklayer Helper (construction); Brick-Paving Checker (construction); Cage Tender (construction); Carpenter Helper, Hardwood Flooring (construction); Cement-Mason Helper (construction); Clamper (construction); Cold Patcher (construction); Concrete-Pump-Operator Helper (construction); Concrete-Vibrator Operator (construction); Connector Hand (construction); Crank Hand (construction); Crushed-Stone Grader (construction); Curb-Setter Helper (construction); Dope Pourer (construction); Dredge Pipe Installer (construction); Dump Grader (construction); Filter-Bed Placer (construction); Floor-Finisher Helper (construction); Floor-Layer Helper (construction; retail trade); Form-Setter Helper (construction); Form Stripper (concrete prod.; construction); Form Tamper (construction); Grader (construction); Grade Tamper (construction); Grouter Helper (construction); Hod Carrier (construction); Hoosier Pole Hand (construction); Inserter (construction); Joint Filler (construction); Laborer, Batching Plant (construction); Laborer, Bituminous Paving (construction); Laborer, Cement-Gun Placing (construction); Laborer, Concrete Paving (construction); Laborer, Corrugated-Iron-Culvert Placing (construction); Laborer, Electric Power And Transmission Line (construction; utilities); Laborer, Heading (construction); Laborer, Pile Driving, Ground Work (construction); Laborer, Pipeline (construction); Laborer, Plumbing (construction); Laborer, Road (construction); Laborer, Shaft Sinking (construction); Laborer, Shore Dredging (construction); Laborer, Steel Handling (construction); Laborer, Stone Block Ramming (construction); Laborer, Wrecking and Salvaging (construction); Loft Worker, Pile Driving (construction); Material Hauler (construction); Miner Helper (construction); Mixer, Hand, Cement Gun (construction); Mold Maker (construction); Mortar Mixer (concrete prod.; construction); Mucker (construction); Mucker, Cofferdam (construction); Mud-Jack Nozzle Worker (construction); Oil Sprayer (construction); Painter Helper (construction); Paperhanger, Pipe (construction); Paper Latcher (construction); Paper Spooler (construction); Paving-Bed Maker (construction); Paving Rammer (construction); Pipe-Layer Helper (construction); Pipe-Machine Operator (construction); Plasterer Helper (construction); Portable Grout-Mixer Operator (concrete prod.; construction); Puddler, Pile Driving (construction); Reinforcing-Iron-Worker Helper (construction); Reinforcing-Steel Worker, Wire Mesh (construction); Riprap Placer (construction); Roofer Helper (construction); Roofer Helper, Vinyl Coating (construction); Sheeting Puller (construction); Sheet-Pile-Hammer Operator (construction); Skip Tender, Concrete Mixing or Batch Plant (construction); Slicer (construction); Squeegee Finisher (construction);

8

RE: JAVIER BANDA

Stain Remover (construction); Stone-And-Concrete Washer (construction); Stonemason Helper (construction); Stone Unloader (construction); Structural-Steel-Worker Helper (construction); Subgrade Tester (construction); Track Layer (construction); Track-Repairer Helper (construction); Trench Trimmer, Fine (construction); Wallpaper Remover, Steam (construction); Wall Washer (construction); Waterproofer Helper (construction); Well Digger (construction); White Washer (construction).

GOE: 05.12.03 STRENGTH: V GED: R2 M1 L1 SVP: 2 DLU: 79
ONET CROSSWALK: 98312 Helpers- Carpenters and Related Workers

In terms of the physical requirements of such work, the Strength code listed above is "V," which is defined as: "Very Heavy Work - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force frequently, and/or in excess of 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Heavy Work."

If Mr. Banda had not been injured on 8/22/17, it is opined that he would have been able to maintain employment as a union laborer for the remainder of his worklife.  It is anticipated that his wages, rate of pay increases, and benefits would have corresponded with his compensation history.  Earnings records from 8/1/16 - 8/30/17 reflect pay of $77,690 during that period.  He had worked for Vulcan Construction for 14-15 years, and stated that he was doing well there.  Mr. Banda noted that two of his brothers and a nephew work for the same company.

## POST-INCIDENT VOCATIONAL ANALYSIS

Following the incident 8/22/17, it is opined that Mr. Banda's vocational capacity has changed.  Dr. Edwards, Mr. Banda's treating physician in physical medicine and rehabilitation indicated in his report of 9/20/18 that Mr. Banda is precluded from returning to his usual occupation.  He noted that Mr. Banda had reached maximum medical improvement for his right above-knee amputation.  Discussion took place with Dr. Edwards on 8/19/19.  In terms of his work capacity, Dr. Edwards opined that Mr. Banda would be limited to work at the Sedentary level of physical exertion.  He also noted that Mr. Banda should sit for no more than an hour at a time, and should then stand or walk for 5-6 minutes prior to resuming a seated position.  Dr. Edwards indicated that Mr. Banda would be able to drive to and from work, but is precluded from driving on the job.  In order to minimize issues with getting in and out, ideally, Mr. Banda's personal vehicle would be lower to the ground than his pickup truck.  He should avoid working outdoors due to the need to avoid perspiration.  In terms of a work schedule, it would be advisable for Mr. Banda to work 4 hours/day initially, to increase his schedule to 6 hours/day after 4-6 weeks, and then to increase to 8 hours/day after another 4 weeks.

Mr. Banda participated in a functional capacity evaluation with Dr. Diana Bubanja, DPT, on 8/20/19.  Discussion took place with her that day.  Dr. Bubanja opined that Mr. Banda is limited to safely lifting a maximum of 5 lbs., and is unable to carry objects of any weight.  Her opinions regarding Mr. Banda's work capacity were similar to those of Dr.

RE:  JAVIER BANDA

Edwards, identifying his maximum capacity within the Sedentary level of physical exertion, and the need to alternate between sitting and weightbearing.

Vocational testing conducted at the Center for Career Evaluations (CCE) suggested the ability to perform sedentary tasks while alternating positions.

Given all of this information, post-injury, Mr. Banda will be unable to return to work as a laborer.  While considering his post-injury physical capacities, Mr. Banda's experience only in physically demanding occupations, his limited educational background, inability to speak English, low scores on non-verbal intellectual functioning, as well as low scores on almost all of his vocational testing, and the labor market where he resides, Mr. Banda's employability is significantly compromised.  While considering all factors affecting Mr. Banda's ability to work, it is probable that he is permanently precluded from returning to any form of employment in the open labor market.

************************

**Mr. Banda's pre- and post-incident vocational capacity is summarized below:**

| PRE-INCIDENT VOCATIONAL CAPACITY |
| --- |

**Laborer**

Continue working as a union laborer          8/22/17 - remainder of worklife

Wages/benefits per actual compensation history

| POST-INCIDENT VOCATIONAL CAPACITY |
| --- |

**No employment options.**

# EXHIBIT I

# • Carol **Hyland** M.A., M.S., C.L.C.P., C.D.M.S.

*Rehabilitation Consultant*
*Certified Life Care Planner*
*Certified Disability Management Specialist*

4120 Canyon Road
Lafayette, California 94549
Phone (925) 283-6702
Fax (925) 283-5322
hylandsec@gmail.com

September 30, 2019

Rebekka Martorano, Esq.
The Ryan Law Group
400 Capitol Mall, Suite 2540
Sacramento, CA 95814
916-924-1912; 923-3872

Re:  **Banda, Javier**

**REBUTTAL**
**VOCATIONAL EVALUATION**
**FOR**
**JAVIER BANDA**

Dear Ms. Martorano:

**QUALIFICATIONS**

I am a rehabilitation counselor with more than 40 years of
experience working with individuals with disabilities, assisting
them in obtaining, retaining and preparing for employment.  A
curriculum vitae, list of publications, rate schedules, and
trial and deposition testimony are also attached.

**INTRODUCTION**

You have asked me to respond to the report prepared by
rehabilitation counselor Ms. Maria Brady dated September 10,
2019.  To accomplish this evaluation, I have reviewed the
following records:

1)   Deposition of Javier Banda, dated 6/6/19;

Rebekka Martorano, Esq.
Re: Banda, Javier
September 30, 2019
Page 2


2)   Paradigm Management Services billing;
3)   2012-2017 W-2s;
4)   Vulcan Construction & Maintenance paystub;
5)   Plaintiff's Rule 26 Initial Disclosure;
6)   Documents produced by Travelers:
        a. Eden Medical Center
        b. Mark Zeme, MD
        c. Darrell Hayes, MD
        d. Sutter Health
        e. HealthSystems
        f. John Edwards, MD
        g. IME report Scott Graham, MD, dated 1/16/19
        h. Shen Wang, MD
7)   Documents produced by Paradigm:
        a. Sutter Health
        b. Elyssa Feinberg, MD
        c. Paramedics Plus
        d. Mark Zeme, MD
        e. Eden Medical Center
        f. Darrell Hayes, MD
        g. East Bay Trauma and Acute Care Services
        h. Victor Pao, MD
        i. James Crew, MD
        j. Santa Clara Valley Medical Center
        k. Chitra Shanmugham, DDS/Western Dental & Orthodontics
        l. Paradigm Outcomes
        m. Therapy Specialists
        n. Eye Surgical & Medical Associates
        o. John Edwards, MD
        p. Synchrony of Visalia
        q. Driving Fitness Evaluations
        r. Report of Scott Graham, MD, dated 1/16/19
8)   Richard Barnes, CPA expert file;
9)   Maria Brady, MS expert file; and
10)  Diana Bubanja, DPT, CLCP expert file.


**DEMOGRAPHICS**

Mr. Javier Banda is a 47-year-old male, born on May 12, 1972,
who sustained injuries in an on the job accident that occurred

Rebekka Martorano, Esq.
Re: Banda, Javier
September 30, 2019
Page 3

on August 22, 2019 and which resulted in an above-the-knee
amputation of his right leg as well as a right orbital wall
fracture, right nostril ear and lacerations.

Mr. Banda lives in Orosi California.  He is married and has a
15- and 16-year-old child at home.  He has a 24-year-old
daughter who is married and lives outside his family home.

According to his deposition, Mr. Banda completed even years of
education in Mexico.  He came to the United States at the age of
19 but had no additional formal education.  He reports poor
reading kills in Spanish and English.  He has, by his
description, poor oral English receptive and expressive skills.

Mr. Banda worked as a construction laborer for Vulcan
Construction and Maintenance from 2002 or 2003 until the date of
his injury.  His work was mostly in the Fresno area.  He
repaired gas and water pipelines, installed pipes, did
excavations ad repaired sidewalks.

Prior to his work with Vulcan, Mr. Banda did various farm
laborer positions.  He picked grapes, peaches, nectarines,
cherries, and oranges, and worked on a pig farm performing a
variety of chores.

The report of Ms. Brady indicates that Mr. Banda notes physical
tolerances for standing of 15 to 20 minutes, sitting for 15 to
30 minute, walking up to 10 minutes.  He is unable to squat,
crawl, or kneel.  He estimates lifting at 10 to 15 pound; he is
left hand dominant.  Ms. Brady reports Dr. Edwards' opinion that
Mr. Banda is limited to sedentary positions where he should sit
for an hour and then stand or walk for five to six minutes.  Dr.
Edwards reportedly barred Mr. Banda from on-the-job driving and
noted that he should avoid outdoor work due to the sweating and
perspiration.

## VOCATIONAL ANALYSIS

Ms. Brady's vocational test results show reading below the first
grade level, general reasoning at the third percentile, finger

Rebekka Martorano, Esq.
Re: Banda, Javier
September 30, 2019
Page 4


dexterity at the fourth percentile and normal color
discrimination.  She correctly concludes that Mr. Banda's
testing suggests that he would perform best learning new skills
on the job rather than in a formal educational setting.

Mr. Banda is clearly unable to return to work as a laborer.  Ms.
Brady concludes that given the entirety of his vocational
profile, his employability is significantly compromised.

While this is true, it does not mean that Mr. Banda is
necessarily totally precluded from the labor market.  Per Ms.
Brady, he expresses a desire to return to work and given this,
it would be appropriate to offer him vocational rehabilitation
services toward that goal.  As a part of that program, tutoring
or classes toward the development of very basic computer skills
and very basic English skills would be advised.  Also classes or
on-the-job training in basic office protocols would help orient
Mr. Banda to a work environment that differs from his
experience.

Positions that would be worthy of consideration would be
selective security positions such as alarm monitoring, selective
motel clerk positions or selective counter clerk or cashiering
positioning.  Not all position within these job categories will
meet his physical restrictions or his language limitations but a
number would.

According to the California Employment Development Department,
wages in the Fresno area for a hotel desk clerk is $11.65 per
hour increasing to $12.49 per hour with three years of
experience.  A security guard position starts at $11.76 per hour
increasing to $12.81 per hour with three years of experience.  A
cashier position starts at $11.36 an hour increasing to $11.93
per hour with three years of experience.

Rebekka Martorano, Esq.
Re: Banda, Javier
September 30, 2019
Page 5


If you have any questions, please let me know.

                    Sincerely,

                    Carol Hyland

                    Carol Hyland
                    M.A., M.S., C.D.M.S., C.L.C.P.
                    Rehabilitation Consultant

CH:kd

# EXHIBIT J

Carol Hyland
November 08, 2019

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JAVIER BANDA; and ELIDA BANDA;

       Plaintiff,

   vs.                                No. 3:18-CV-05329-JCS

JOHN DEERE; HERC RENTALS, INC.;
and DOES 1 to 100, inclusive

       Defendants.
_____/

DEPOSITION OF CAROL HYLAND

November 8, 2019

10:06 a.m.

2030 Franklin Street, Sixth Floor

Oakland, California

REPORTED BY:

Carolyn M. Mann

CSR No. 10066, RPR

1    Q.   And does that affect your analysis, your

2    evaluation?

3    A.   Sure.

4    Q.   If he, for example, had less motivation to

5    return, would that affect your analysis of his options?

6    A.   I guess it depends on how you mean the word

7    "options" in that.  So I don't think the fact that he's

8    desirous of going to work changes the options of the

9    type of work he can do.  But if somebody is not desirous

10   of returning to work, it's like pushing a rock uphill.

11        And so, I mean, he has a number of issues,

12   obviously, in terms of any kind of thought of returning

13   to work.  If he were also uninterested in it, you know,

14   then you're kind of dead in the water because you don't

15   have the oomph or the motivation or the desire to go

16   forward.

17   Q.   Okay.  So Ms. Brady's evaluation concludes that

18   Mr. Banda is not capable of returning to work, not

19   capable of competing in the open labor market, correct?

20   A.   Correct.

21   Q.   And your opinion is different than that.

22   A.   Well, I have a little bit of a yes and no to

23   that.

24        So there's some things about the data that I

25   have that are bothersome to me.  Her -- Miss Brady's IQ

1    testing puts Mr. Banda at the -- at an IQ of 71.  Every

2    state's a little different about this, but if you

3    combine her -- and that 71 was on a nonverbal IQ score

4    equivalent.  If you combine that with Dr. Nance's

5    findings that are similar, expressed differently in his

6    report but similar, and look at where he is on kind of a

7    verbal IQ score as well as a performance, Mr. Banda's

8    also roughly at that same level.  Those levels put you

9    eligible for services on the basis of being

10   developmentally disabled.

11           That level of intellectual functioning, whether

12   it's verbal or nonverbal, is inconsistent with his work

13   history.  Not saying he had to read and write to do his

14   job.  I'm not even to the point of looking at that whole

15   issue about literacy.  But that IQ score, in my mind,

16   is, you know probably one of the most significant issues

17   in terms of what somebody's potential for

18   rehabilitation, retraining, re-education, something,

19   might be.  It's not the only one, but it certainly is a

20   significant one.  And so what we've got is somebody who

21   not only on Miss Brady's testing but on the

22   neuropsychological testing shows very, very limited

23   capacity -- such limited capacity that if you would ask

24   me without knowing what his work history is to predict

25   what it would have been, I would have told you he was

```
 1    not likely to be competitively employable.  Because the

 2    problem you have with somebody at that IQ level is they

 3    can't maintain an adequate pace of work.  And that's why

 4    they become eligible for regional center services and

 5    Department of Developmental Services for the state, and

 6    why they would have an almost automatic eligibility for

 7    Social Security Supplemental Security Income on the

 8    basis of IQ alone.

 9            But that's not Mr. Banda.  That's not who he is

10    historically.  So when I look at who he is or what I

11    know of who he is historically and then look at that

12    testing, it says to me something's amiss.

13            So if one would -- so if one would just look at

14    his testing, and let's say he were an 18-year-old and we

15    had no work history and we didn't know how he had been

16    in the work world, I would tell you it's clearly not

17    likely that he would be competitively employable, just

18    on the basis of his IQ.  But he's got, what, 12, 13, 14

19    years of consistent employment with favorable reviews,

20    praise for being a good hard worker, maintaining an

21    adequate pace, doing all of that.  So in my report what

22    I basically said is I'm not, despite the testing, quite

23    willing to write him off.

24            What I would recommend is that -- I mean,

25    obviously, he doesn't do well on testing, we got that,
```

 1    but what I would recommend is that we do some type of

 2    situational assessment.  And that could be done in a

 3    number of ways.  I mean, it could be that you start with

 4    putting him in, you know, a specialized ESL class, see

 5    how he does with that to see if there's a difference in

 6    his ability to learn and develop skills on a practical,

 7    applied, hands-on situational assessment environment,

 8    even though I would totally agree that if you just look

 9    at his testing, he's not employable.

10        Q.   Okay.

11        A.   I don't know the outcome of that, but I think

12    it's an incomplete analysis in his particular case not

13    to have that.

14        Q.   I understand.  So what you're saying is there's

15    inconsistency between the IQ number that is shown in the

16    testing and the work history because someone with that

17    IQ wouldn't be expected to have that kind of consistent,

18    enduring work history.

19        A.   Correct.

20        Q.   Okay.

21        A.   Satisfactorily performed.  Which to continue

22    for that long it has to be; you know what I mean?

23        Q.   You saw in the medical records that he had some

24    facial lacerations, right?

25        A.   Yes.

1   by the state Department of Developmental Services, and

2   there's like 26 regional centers around the state.  And

3   they provide services to people who are developmentally

4   disabled, as long as that developmental disability

5   happened before the age of 18.

6       Q.   Okay.

7       A.   So I'm not suggesting he's necessarily a

8   candidate for that or anything; that's not really the

9   point here.  But if you -- if you -- if you take a look

10  at their criteria, and he came to the state Department

11  of Rehab looking for competitive employment, you know,

12  we would refer him to someplace like Department of

13  Developmental Services to do something that would be

14  more supported or sheltered employment.  Because,

15  because the minimum kind of IQ level for competitive

16  employment that we generally used was 75.  But that --

17  but that means you're going to be doing something

18  that's, you know, very routine and repetitive,

19  obviously.

20      Q.   Are you going to offer the opinion at trial

21  that his IQ -- before this incident, at least -- was

22  higher than 71?

23      A.   You know, I have no way of knowing what his IQ

24  would have tested like before this.  But what I can say

25  is his performance, the fact that he was able to be

November 08, 2019

1    consistently, reliably successfully employed for that

2    length of time is inconsistent in my thinking with

3    somebody who has a 71 IQ.

4        Q.   Is it going to be your opinion that his IQ now

5    is not 71?

6        A.   Well, that's how it tested.  But again, I, I

7    think it's in -- I can't do anything with the testing

8    other than what the testing says, you know.  So it is

9    what it is.  But I think functionally, at least

10   historically, he has functioned much better than you

11   would expect anybody with a 71 IQ to function.

12       Q.   Would he be able to function in the types of

13   jobs that you've identified if his IQ is now 71?  And by

14   the types of jobs, now we're talking about selective

15   security positions or selective motel clerk positions or

16   counter clerk/cashiering positions.

17       A.   No.  And I would tell you with a 71 IQ, he also

18   would not have been able to work as a construction

19   laborer --

20       Q.   Okay.

21       A.   -- or a construction worker successfully with

22   that IQ.

23       Q.   All right.

24       A.   It's just too low for pace issues.

25       Q.   On page 4 of your report you say, after talking