UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAVIER BANDA, et al.,

            Plaintiffs,

     v.

HERC RENTALS, INC., et al.,

            Defendants.

Case No. 18-cv-05329-JCS

**ORDER RE DAUBERT MOTIONS**

Re: Dkt. Nos. 68, 70, 71, 72

## I.     INTRODUCTION

      This action arises out of an incident that occurred on August 22, 2017, when Plaintiff Javier Banda, a journeyman employed by Vulcan Construction & Maintenance, Inc. ("Vulcan") was seriously injured by a backhoe that slid or rolled backwards into a trench, resulting in an above-the-knee amputation of Banda's right leg. Javier Banda and his wife assert product liability claims against the company that manufactured the backhoe, John Deere ("Deere"), and the company that rented the backhoe to Vulcan, Herc Rentals, Inc. ("Herc"), including claims that the backhoe had design defects and that Defendants failed to provide adequate warnings. Presently before the Court are the following motions to exclude expert testimony under Rule 702 of the Federal Rules of Evidence: 1) Plaintiffs' Daubert Motion to Exclude Certain Opinions of Charles Mahla, PhD ("Mahla Motion"); 2) Plaintiffs' Daubert Motion to Exclude Certain Opinion Testimony of Carol Hyland ("Hyland Motion"); 3) Plaintiffs' Daubert Motion to Exclude Certain Opinion Testimony of Sam Iler ("Iler Motion"); 4) Deere & Co.'s Daubert Motion to Exclude Expert Testimony of Brian Doherty, Myles Kitchen, Mark Dimas, and Gerald Fulghum ("Deere Motion"). A hearing on the Motions was held on January 17, 2020. The Court's rulings are set

forth below.[1]

## II.    BACKGROUND

Javier Banda was 47 years old at the time of the accident that is the subject of this case and had worked for Vulcan as a construction worker for more than 15 years.  When the accident occurred, Banda and the Vulcan crew had been working for several weeks digging trenches in the streets of a residential neighborhood in Castro Valley, California as part of a PG&E project to service its underground natural gas lines.  PG&E workers pre-marked the areas where the Vulcan crew was to dig and then the Vulcan crew would remove the asphalt with a jackhammer and use a backhoe to dig a trench. To reduce the risk that the backhoe bucket would strike the gas line, once they got close to the line, the crew would stop using the backhoe to dig and crew members would get in the trench and dig with shovels to expose the gas line.

On the day of the accident the Vulcan crew was using a 2011 John Deere Model 310J Backhoe Loader ("the Backhoe") it had rented from Herc Rentals. The Backhoe consists of a tractor fitted with a loader shovel/bucket on the front and a backhoe excavator on the back. There is only one seat for the operator, who selects the direction the seat is facing depending on the task to be performed. The seat is faced forward if the operator wants to drive the tractor or operate the front loader bucket.  The operator rotates the seat 180 degrees so that it is facing rearward to operate the backhoe excavator.  The Backhoe is equipped with two hydraulic outriggers that can be extended on each side to stabilize it by lifting the rear of the Backhoe off the ground.

At the time of the accident, the Backhoe was being operated by Vulcan employee Bernabe Tovar. Tovar had positioned the Backhoe uphill from a trench and was using it with the stabilizers lowered to dig the trench. When Tovar finished digging, Banda immediately entered the trench to clear out the remaining debris with a shovel. The accident occurred when Tovar raised the stabilizers and started to rotate his seat from the backhoe position to the front in order to drive the Backhoe away from the trench. He did not have the parking brake set and the engine was on and in neutral. When the stabilizers were raised, the Backhoe rolled or slid backwards into the trench. As

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

the Backhoe moved backwards, Tovar and/or other workers yelled at Banda, who tried to get out of the trench. Banda was not able to get all of the way out of the trench, however, and sustained injuries to his leg that required amputation.

Javier Banda now uses a prosthetic leg and is unable to return to his previous job as a journeyman union laborer. The parties disagree as to whether he is able to perform any work.

## III.    ANALYSIS

### A.    Legal Standards Under Rule 702 of the Federal Rules of Evidence and *Daubert*

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc*., in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id*. (quoting Webster's Third New International Dictionary 1252 (1986)). The Court declined to set forth a

3

definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met. *Id*. at 593. These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). However, when such evidence is not available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how they went about reaching their conclusions and point[ing] to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id*. at 1319.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id*. at 591. This is a question of "fit," and "is not always obvious." *Daubert*, 509 U.S. at 591. The Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id*. To meet this requirement there must be "a valid scientific connection to the pertinent inquiry." *Id*. In other words, the expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal., 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id*. (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). "Therefore, a federal judge should exclude scientific expert testimony under the second prong of

4

the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Id.* (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

### B. Plaintiffs' *Daubert* Motions

#### 1. Mahla Motion

##### a. Background

Defendants disclosed Dr. Mahla as a rebuttal expert. Declaration of Kevin M. Osborne in Support of Plaintiffs' Daubert Motion to Exclude Certain Opinion Testimony of Charles Mahla, PhD ("Osborne Decl. (Mahla)"), Exs. 2, 3. Dr. Mahla was asked to provide estimates of: 1) Javier Banda's past and future economic loss of earnings and benefits resulting from his injury; and 2) the present value of the cost of future medical care using data from the life care plan of Plaintiffs' expert Dr. Diana Bubanja but assuming that Javier Banda could continue to use his current prosthetic rather than the more expensive one recommended by his prosthetist. *Id.*, Ex. 4 (Mahla Report) at 2; Ex. 5 (Mahla Dep.) at 28.

In his analysis of future loss of earnings, Dr. Mahla assumed that Banda would have worked until age 61 if he had not been injured (his "worklife expectancy"). *Id.*, Ex. 4 (Mahla Report) at 3. He relied on statistics reflecting worklife expectancy for a 45-year-old Hispanic male who is actively employed and has less than a high school education. *Id.* At his deposition, he testified that if the "Hispanic part" were "pull[ed] out" and everything else were the same, the worklife expectancy for Banda would be "slightly higher," though he initially testified that he did not know how this would affect worklife expectancy. *Id.*, Ex. 5 (Mahla Dep.) at 27-28. In contrast, Plaintiffs' retained economist, Richard Barnes, assumed that Javier Banda would have worked until he was 65 but for his accident. Declaration of Rebekka R. Martorano in Support of Defendant Deere & Company's Opposition to Plaintiffs' Daubert Motions to Limit Testimony of Charles Mahla and Carol Hyland ("Martorano Opposition Decl."), Ex. C (Barnes Dep.) at 16. Mr. Barnes testified at his deposition that he was asked to assume that Banda intended to work at least until he was 65 and that in any event, this was when Banda "would be eligible for Medicare to the extent that his health insurance is tied to his job." *Id.*

With respect to the present value of the cost of future medical care, Dr. Mahla originally

assumed that the cost of Banda's prosthetic used in Dr. Bubanja's report of $100,000 was accurate but he was asked to revise this cost after Defendants deposed Banda's prosthetist, Jason Schott, and learned that the cost of Banda's current prosthetic was only $55,076.93 and that the higher figure was for a prosthetic that he might upgrade to in the future. In particular, Mr. Schott testified that Banda "has the potential to use a higher-end prosthetic knee" and that he would "do a trial" with Banda. Martorano Opposition Decl., Ex. G (Schott Dep.) at 35. Based on Schott's testimony, Defendants' counsel asked Dr. Mahla to recalculate Banda's future medical costs using the assumption that he would not upgrade to the more expensive prosthetic.

In their *Daubert* Motion, Plaintiffs object to Dr. Mahla's reliance on Javier Banda's Hispanic ethnicity as a basis for reducing his worklife expectancy to 61 years of age, citing cases in which courts have found that reliance on race to reduce future earnings is discriminatory and potentially unconstitutional. Mahla Motion at 4-5. They further assert that there is no evidence to support the assumption that Javier Banda can continue to use his current prosthetic and therefore, that Dr. Mahla should not be allowed to offer his opinion based on that assumption with respect to the present value of Banda's future medical costs. *Id*. at 5.

Defendants oppose Plaintiffs' *Daubert* Motion with respect to Dr. Mahla's opinions. They argue that it was proper for Dr. Mahla to rely on statistics for the worklife expectancy of Hispanic males with Banda's level of education, pointing out that Mr. Barnes did not rely on any statistical evidence to support his assumption that Mr. Banda would have worked until he was 65. Defendants' Opposition (Mahla and Hyland) at 2. Defendants also assert that by factoring race in, Dr. Mahla actually increased the worklife expectancy as "the statistical worklife expectancy of Hispanic males is higher than that of males generally." *Id*. at 2. With respect to Dr. Mahla's calculation of Mr. Banda's future medical costs, Defendants contend it was proper to use the lower cost prosthetic because that is what Banda is using now.

       b. Discussion

          i. Consideration of Race in Determining Worklife Expectancy

In support of their argument that consideration of race to reduce worklife expectancy is not permissible, Plaintiffs cite *McMillan v. City of New York*, in which the court addressed whether it

is proper to use statistics that factor in race as a basis for reducing damages. 253 F.R.D. 247

(E.D.N.Y. 2008). In a thoughtful opinion, the court concluded that race-based statistics are

unreliable and further, that use of race-based statistics (including statistics for worklife

expectancy) to reduce damages is a violation of both equal protection and due process.

Defendants do not challenge the reasoning in *McMillan* or make any meaningful argument

that it is permissible to reduce damages based on race. Instead, they point out that the statistics for

males generally with the same level of education as Banda, as reflected in the publication upon

which Dr. Mahla relied, show a *shorter* worklife expectancy than for Hispanic males with that

level of education. *See* Martorano Opposition Decl., Ex. E (Life and Worklife Expectancies,

Hugh Richards and Michael Donaldson, Second Ed.) at 154, 160. In other words, Dr. Mahla was

mistaken when he testified that if consideration of race were removed and everything else stayed

the same the statistical worklife expectancy would be higher. In light of this evidence, Plaintiffs

withdrew their objection to Dr. Mahla's consideration of Banda's race in determining his

statistical worklife expectancy at the motion hearing. Therefore, the Court need not rule on this

objection.

        ii.  Use of Lower Prosthetic Cost for Calculation of Future Medical Costs

Plaintiffs challenge Dr. Mahla's estimate of future medical costs based on the assumption

that Banda will continue to use the same prosthetic he is using now rather than the more expensive

prosthetic that his prosthetist opines is appropriate. According to Plaintiffs, there is no evidence at

all to support this opinion. Yet Schott's testimony – and the fact that Schott initially

recommended the less expensive prosthetic for Banda, who is wearing it now – is at least some

evidence that the more expensive prosthetic may not be required. The Court concludes that this

challenge goes to the weight of Dr. Mahla's testimony and does not warrant exclusion of his

opinions under Rule 702. Therefore, the Court DENIES Plaintiffs' request that Dr. Mahla be

precluded from offering opinions about Mr. Banda's future medical costs that are based on the

assumption that Mr. Banda will continue to use the prosthetic that he uses now.

### 2. Hyland Motion

#### a. Background

Defendants disclosed Carol Hyland as a rebuttal expert to provide a vocational evaluation of Banda. Declaration of Kevin M. Osborne in Support of Plaintiffs' Daubert Motion to Exclude Certain Opinion Testimony of Carol Hyland ("Osborne Decl. (Hyland)"), Exs. 2, 3. In her expert report, Hyland addresses the opinions of Maria Brady, a rehabilitation counselor who Plaintiffs have designated as an expert. *Id.*, Ex. 4 (Hyland Report) at 1; *see also* Martorano Opposition Decl., Ex. H (Brady Report). Brady concluded that Javier Banda has "no employment options" following his accident, relying in part on the results of vocational testing that she conducted, including IQ testing. Martorano Opposition Decl., Ex. H (Brady Report) at 6-7, 10. Hyland, on the other hand, opined that Banda was not "necessarily totally precluded from the labor market" and that "[p]ositions that would be worth of consideration would be selective security positions such as alarm monitoring, selective motel clerk positions or selective counter clerk or cashiering position[s]." Osborne Decl. (Hyland), Ex. 4 (Hyland Report) at 4.

At her deposition, Hyland testified that she reached the conclusion that Banda was not precluded from all work despite Brady's testing that revealed an IQ of 71 – which would have been too low to perform the jobs listed in Hyland's report – because of Banda's work history. *Id.*, Ex. 1 (Hyland Dep.) at 19-21. In particular, she testified that she "would totally agree that if you just look at his testing, he's not employable" but that Banda's test results are "inconsistent with his work history," suggesting that the analysis of his future ability to work is "incomplete" without "some type of situational assessment." *Id.* Hyland did not identify any flaws in the testing methodology, testifying that she did not know enough about how the test was administered to be able to comment and that she was not "suggesting that the test didn't show what either evaluator is saying it showed." *Id.* at 26-27.

Plaintiffs contends there is no evidentiary basis for Hyland's opinions that Banda can perform jobs that are inconsistent with the results of his educational testing and that rather than pointing to any scientific basis for challenging the test results, Hyland is simply speculating about Banda's ability to work. Therefore, Plaintiffs ask the Court to preclude Hyland from testifying

that the test results are wrong or that Banda can work.

b. Discussion

Plaintiffs' challenge goes to the weight of the evidence rather than its admissibility. Although Hyland may not testify that the test results are "wrong" (an opinion that she does not offer in her report or in her deposition), she is qualified to testify that Banda's work history suggests that the test results may not provide a complete picture of his ability to work. The Court DENIES Plaintiffs' motion.

**3. Iler Motion**

a. Background

Herc has disclosed Sam Iler as a workplace safety expert witness. Declaration of Kevin M. Osborne in Support of Plaintiffs' Daubert Motion to Exclude Certain Opinion Testimony of Sam Iler ("Osborne Decl. (Iler)"), Exs. 1, 3. Herc's disclosure of Iler states that Iler was retained to address Vulcan and its employees' "negligence and compliance with applicable industry safety standards" in connection with the accident that led to Banda's injury. *Id.*, Ex. 3. He was also disclosed as a rebuttal expert witness to address the opinions of Plaintiffs' safety expert, Gerald Fulghum. *Id.*, Ex. 5.

In his report, Iler opined that the Backhoe operator, Tovar, had failed to meet the "Standard of Care" with respect to operating the Backhoe, defining "Standard of Care" as "include[ing] the applicable industry standards, applicable Cal-OSHA regulations, applicable federal OSHA regulations, and best practices concerning workplace safety and reasonable actions by the party." *Id.*, Ex. 4 (Iler Report) at 2. Among other things, Iler opined that "Tovar's positioning of the machine lacked the utilization of safe practices for excavating on inclines" and that Tovar "failed to meet the Standard of Care by storing multiple unsecured items in and around the cab area of the Backhoe." *Id.* at 2-3. Similarly, Iler opined that "Mr. Banda entered the zone of danger near the rear of the Backhoe in violation of company policy, OSHA and Manufacturer requirements." *Id.* at 4. Iler concluded that Tovar, Banda and Vulcan failed to meet the Standard of Care by, among other things, "failing to properly train or follow training while operating or working near a backhoe per OSHA and manufacturer requirements." *Id.* at 5.

At his deposition, Iler was asked to identify the specific OSHA regulation that was purportedly violated by Banda when he entered the "zone of danger" and more generally, by Banda, Tovar and Vulcan with respect to operating or working near a backhoe. *Id.*, Ex. 2 (Iler Dep.) at 54, 61-62. Iler testified that he had "just read it" before his deposition but he acknowledged that he had not included it in the materials he had produced and did not know it "off the top of his head." *Id.*

Iler also testified at his deposition that it was possible to move the Backhoe along a trench while the seat is in the backwards position. *Id.* at 11-14. Iler testified that his understanding of how this feature works was based on an operator's manual for John Deere tractors that he found online, but he was unable to download the manual and produced only screen-shots of specific pages. *Id.* at 14-15. He also testified that moving a backhoe in this manner was a "common practice." *Id.* at 14.

Finally, in his rebuttal report Iler responded to Plaintiffs' expert's opinion that the lack of a backup alarm when the Backhoe was moving backwards in neutral put workers at risk by stating:

> It is well known that trade workers that are consistently exposed to equipment alarms can become unaware of the presence of a hazard associated with a backup alarm as they become desensitized and fail to respond after a period of time.

Osborne Decl. (Iler), Ex. 5 (Iler Rebuttal Report) at 2. At his deposition, Iler testified that in connection with this opinion he had produced an article that he found online entitled "Human Probability Matching Behavior in Response to Alarms of Varying Reliability." Osborne Decl. (Iler), Ex. E (Iler Dep.) at 29. Iler testified that he used this article for "reference" and that he did not know where the article was published or if it appeared in a peer-reviewed journal. *Id.* He also testified that although he has never done any survey of his own regarding "alarm fatigue" it is a phenomenon he is familiar with from his "experience in the industry" and a subject on which he has provided safety training. *Id.* at 73-74.

Plaintiffs ask the Court to preclude Iler from testifying that Banda and his employer did not adhere to OSHA standards or to offer opinions based on the operator's manual or the article about alarm fatigue that he found online, arguing that all of these opinions lack a proper foundation and

are therefore unreliable under Rule 702. To the extent that Iler relies on his own experience in support of his opinions about alarm fatigue, Plaintiffs argue that he is not qualified to offer expert opinions on that subject.

        b. Discussion

With respect to Iler's opinions that Vulcan and its employees (including Banda) did not adhere to the Standard of Care, the failure to identify a specific OSHA regulation that was regulated does not render Iler's opinions unreliable as the Standard of Care as defined by Iler takes into consideration not only OSHA regulations but also encompasses best practices in the industry and manufacturer requirements. Nonetheless, to the extent that Iler has offered testimony that certain opinions in his report were based on an OSHA regulation that has not been disclosed (and the time for such disclosures has now passed) Iler may offer opinions based on that regulation only if he discloses to Plaintiffs, **within one week of the date of this Order**, the specific OSHA regulation to which he was referring at his deposition. Iler may also offer opinions addressing OSHA § 1592, which he addressed in his rebuttal report and in his deposition. Apart from these two OSHA regulations, Iler will not be permitted to offer opinions about any other OSHA regulations.

With respect to manufacturer guidelines, Iler will not be permitted to offer testimony that is based on the operator's manual that he found online as he has not established that this document applies to the Backhoe in this case. Iler could have requested that Deere provide him with the operator's manual for the specific Backhoe involved in the accident. He did not do so. The mere fact that the document appears to be a Deere publication (Herc points to a 2013 Deere copyright on one of the screenshot pages in its opposition brief) does not provide a sufficient foundation to establish that the publication he relied upon was applicable to the 310J Backhoe or that the select screenshots he produced are an accurate statement of Deer's guidelines for operating that particular backhoe.

With respect to the publication about alarm fatigue that Iler produced, Herc does not attempt to establish that this article was "peer-reviewed"; nor does it address whether the methodology used by the authors was reliable. Therefore, if this article were the only basis for

Iler's opinions about alarm fatigue, those opinions would not be admissible under Rule 702. However, Iler has testified that he has an independent basis for his opinions about alarm fatigue, namely, his own experience in the industry, which includes providing safety training to address the phenomenon. This is a sufficient foundation for Iler to opine that the existence of alarm fatigue is a well-known problem and therefore, Iler may offer that opinion at trial. On the other hand, Iler will not be permitted to go beyond this limited opinion to address the *magnitude* of the problem or the specific circumstances under which the problem is more or less salient as no such opinions were offered by Iler in his reports or deposition testimony and Defendants have not demonstrated that Iler is qualified to offer such opinions. Nor will he be permitted to testify as to the contents of the article about alarm fatigue that he found online and produced at his deposition.

For these reasons, the Iler Motion is GRANTED in part and DENIED in part.

### C. Defendants' Daubert Motion

#### 1. Brian Doherty

##### a. Background

Brian Doherty was disclosed by Plaintiffs as an expert and was asked to "reconstruct the accident . . . to determine the effect of timing of warnings on Mr. Banda's ability to . . . get out of the hole in time to avoid [injury]." Declaration of Rebekka R. Martorano in Support of Defendant Deere & Company's Daubert Motion to Exclude Expert Testimony of Brian Doherty, Myles Kitchen, Mark Dimas, and Gerald Fulghum ("Martorano Motion Decl."), Ex. 8 (Doherty Dep.) at 3. According to Doherty's curriculum vitae ("CV"), he has a PhD in biomedical engineering and has worked as a biomedical engineer for over twenty years, specializing in accident reconstruction, among other things. *Id.*, Ex. 1 (Doherty CV).

In his expert report, Doherty opined, *inter alia*, that: 1) the Deere 310J should have had a backup alarm that sounded if the tractor was rolling backward in neutral, *id.*, Ex. 2 (Doherty Report) at 5; and 2) had there been a backup alarm that sounded as soon as the Backhoe began to roll backwards, Banda would have been able to react 1.5 seconds sooner, which would have allowed him to climb completely out of the hole and avoid injury instead of climbing only part of the way out of the hole, *id.* at 16-18.

In his report, Doherty pointed to the comments of Plaintiffs' safety engineer, Gerald Fulghum, in support of his conclusion that the Backhoe should have had a backup alarm. *Id*. at 5. In his deposition, he testified that this opinion was based on his conclusion that a backup alarm would have prevented Banda from being injured. Martorano Motion Decl., Ex. 8 (Doherty Dep.) at 17.

With respect to his opinion that Banda would have escaped injury if the Backhoe had been equipped with a backup alarm, Doherty compared the perception-reaction time ("P-R time") associated with the shouted warning Banda actually received to the P-R time if there had been a backup alarm. *Id*., Ex. 2 at 16. In his comparison, he took into account not only the amount of time that elapsed before the alarms were given (whether the yell from a coworker or the sound of a backup alarm) but also the time it would take to interpret these two different types of warnings. *Id*. at 17. Doherty reasoned that the time it would take to interpret the backup alarm would be less than the time it took Banda to interpret his coworker's yell because he "would not have to determine the meaning of a shout, but would know immediately what the sound of a back-up alarm meant." *Id*. Doherty concluded that because of the shorter P-R time with a backup alarm, Banda would have had an extra 1.5 seconds to get out of the trench. *Id*. He went on to conclude that the extra 1.5 second would have been enough to escape injury based on the location of Banda's injury. *Id*. at 18. In particular, because the injury was at the "distal 1/3" of Banda's body length, and the weight of his leg below the point of injury was about 1/8 of his body weight, Doherty concluded that Banda was almost all the way out of the hole when he was struck, making it likely that the extra time would have been enough to get his body completely out of the hole. *Id*. At his deposition, Doherty testified that his conclusion was based on his own knowledge obtained from research studies in which he participated that it takes a person approximately one second to jump straight up in the air. *Id*., Ex. 8 (Doherty Dep.) at 32. Doherty further testified that he had seen articles in peer-reviewed journals stating that it takes one second for a person to jump straight off the ground but that he could not identify any specific articles. *Id*.

In their Motion, Defendants argue that Doherty is not qualified to opine as to whether the Backhoe should have had a backup alarm as he is not an industrial designer. They further argue

13

that his conclusion that Banda would have escaped injury if there had been a backup alarm involves speculation or ignores actual evidence about how the accident occurred, such as the distance the Backhoe was from the trench, the speed it was moving, when the coworker shouted his warning, Banda's state of mind and whether he was confused by the coworker's warning, and the fact that Banda suffered injuries on his face as well as his leg. They argue that this problem is compounded by the fact that Doherty did not conduct any testing to establish the actual speed the Backhoe was moving, the time it would take for a person to climb out of a trench from different positions and the reaction time for different types of warnings. Defendants also contend Doherty's opinion is unreliable because he was not able to identify any of the articles he said he had seen where it was found that it takes one second for a person to jump straight off the ground. Defendants ask the Court to preclude Doherty from opining that Banda would have escaped injury because of additional P-R time had the Backhoe been equipped with a backup alarm. They also ask the Court to exclude a Powerpoint presentation offered by Doherty that includes two animations, one of which shows Banda getting out of the trench without injury in response to a backup alarm and another purportedly showing the accident. *See* Martorano Motion Decl., Ex. 13. Defendants contend the Powerpoint presentation includes many inaccuracies and misrepresentations of evidence.

      b.   Discussion

      The Court finds that that Doherty is not qualified as an expert with respect to the design of the Backhoe and therefore, that he may not testify that the Backhoe s*hould* have had a backup alarm. On the other hand, Defendants' challenges to Doherty's opinions about what likely would have occurred if the Backhoe *had* been equipped with such an alarm – including whether Banda would have escaped injury – go to their weight and not admissibility. Therefore, Doherty will be permitted to offer such opinions. Nor is the Court persuaded that Doherty's opinions are rendered unreliable because he did not determine the precise speed the Backhoe moved backward, how far it was from the trench or how long it would take for a person to climb out of a trench (among other things). Doherty's opinion was based on a consideration of P-R times and Defendants concede that they are not challenging the general principles of P-R time analysis. Reply at 5. Further, his

opinion does not rely on the absolute amount of time it took for the Backhoe to roll into the trench but rather, addresses the reduction in time for Banda to escape injury as a result of being warned by yells from his coworkers instead of a backup alarm.

The Court therefore GRANTS in part and DENIES in part the Doherty Motion.[2]

### 2. Myles Kitchen

#### a. Background

Plaintiffs retained as an expert Myles Kitchen, an automotive electronics engineer, who was asked to provide information and opinions related to various vehicle safety features and systems of the 310J Backhoe that was involved in this case. Martorano Motion Decl., Ex. 4 (Kitchen Report). In his report, he addressed the feasibility of adding three specific safety features to the Backhoe: 1) a backup alarm that sounds when the 310J Backhoe is in neutral and moving backwards; 2) a parking brake that is automatically set when the operator moves the seat from forward and will not release until the seat is fully forward and the operator releases it; and 3) a "hill assist" feature that will prevent the Backhoe from rolling backwards when it is in neutral. *Id*. He opined that it would be feasible to add all three features to the 310J Backhoe. *Id*. At his deposition, Kitchen testified that he intends to offer the opinions that the absence of these features on the 310J Backhoe are "operational deficiencies." *Id*., Ex. 9 (Kitchen Dep.) at 30-32. He also testified that he intends to offer an opinion that these devices could have prevented Banda from being injured, though he acknowledged that he himself did not have the expertise to evaluate whether Banda would have been able to get out of the hole if there had been a backup alarm. *Id*. at 37-41. Rather, Kitchen relied on the opinions of Doherty in support of this opinion. *Id*. at 38-39.

Defendants challenge all of Kitchen's opinions about feasibility, asserting that while Kitchen has described various ways to implement these safety measures, he has not pointed to any heavy construction equipment that incorporates these safety features[3] and also has not conducted

---

[2] The Powerpoint presentation that includes the animation Defendants challenge was not provided to the Court until the day of the motion hearing and therefore, the Court declines to address its admissibility. The Court will address that issue at the pretrial conference.

[3] Although Defendants make this argument as to all three of Kitchen's proposed safety measures,

any testing to determine if the adaptations he describes would actually work.  Based on Kitchen's CV, Defendants argue further that Kitchen's experience with heavy construction equipment is limited, casting further doubt on the reliability of his feasibility opinions.  *See* Martorano Motion Decl., Ex. 3 (Kitchen CV).  Defendants also argue that Kitchen should not be permitted to offer opinions about operational deficiencies of the 310 J Backhoe because he has no experience in the design of backhoes and therefore is no qualified to offer opinions as to whether the absence of certain features renders it defective.  Finally, Defendants argue that Kitchens is not qualified to offer opinions about whether Banda would have escaped injury if the Backhoe had the three safety features Kitchen addressed.

> b.  Discussion

Defendants' challenges to Kitchen's opinions about feasibility of implementing the three proposed safety features go to the weight of the evidence, not its admissibility.  Courts have recognized that "industry custom and practice sometimes does shed light not just on the reasonableness of the manufacturer's conduct in designing a product, but on the adequacy of the design itself." *Kim v. Toyota Motor Corp.*, 6 Cal. 5th 21, 34 (2018).  Thus, in *Kim v. Toyota*, the California Supreme Court held that the jury "may, in appropriate cases, consider such evidence" in design defect cases.  *Id.* at 39.  However, the Ninth Circuit has made clear that plaintiffs in product defect cases need not point to examples of similar products that contain enhanced safety features in order to show that adding such safety features is feasible, noting that if such an approach were adopted, "there could be no first case demanding improvement of an unsafe (but widely accepted) product design." *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 863 (9th Cir. 2011).[4]  Consequently, the opinion of Plaintiffs' expert that certain safety features are feasible may not be excluded simply because he has not offered evidence that these features have actually been

---

the deposition testimony that Defendants cite addresses only whether Kitchen was aware of any heavy construction equipment that has a backup alarm that sounds when the machine rolls backward in neutral.  *See* Defendants' Motion at 15;  Martorana Motion Decl., Ex. 9 (Kitchen Dep.) at 34-35.

[4] In an unpublished case, the Ninth Circuit relied on *Oswalte* to squarely hold, "[g]iven that a plaintiff need not show an alternative, safer design is already used in similar products, it follows that her expert is not required to have experience with that safer design in such products." *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435, 440 (9th Cir. 2017)

adopted in similar equipment.

Likewise, the proposed design features that Kitchen described were clear and detailed and were capable of being tested. That is all that is required under Rule 702. *See Ramirez*, 686 F. App'x at 440 (holding that district court erred in excluding expert testimony on the basis that expert had not tested alternative design and noting that "the reliability of an expert's theory turns on whether it 'can be tested,' . . . not whether he has tested it himself and that expert's design was "capable of being tested; [defendant] simply chose not to do so, despite bearing the burden under the risk-benefit test to prove" that a safer design was not feasible) (citation omitted). Therefore, Kitchen will be permitted to offer opinions about how the Backhoe could be modified to add a backup alarm, automatic brake and hillside assist, and to describe how these features would work.

On the other hand, the Court agrees with Defendants that Kitchen is not qualified to opine as to whether the absence of the proposed safety features constitute "operational deficiencies." Likewise, Kitchen does not have the expertise to opine that Banda would have had time to get out of the hole if the Backhoe had contained his proposed safety features. Therefore, Kitchen may not offer such an opinion at trial. In all other respects, Defendants' requests to preclude Kitchen's opinions are denied for the reasons stated above.

### 3. Mark Dimas

#### a. Background

Mark Dimas worked for 37 years operating heavy equipment, including backhoes. Martorano Motion Decl., Ex. 5 (Dimas Report) at 1. According to his expert report, he spent 40% of his time working underground construction projects. *Id.* At his deposition, he testified that 40% to 50% of his heavy construction career was spent operating backhoes. *Id.*, Ex. 10 (Dimas Dep.). Plaintiffs designated him as an expert to testify about his experiences as an operator. In his report, Dimas offered the following opinions:

> Opinion 1: The Deere 310J should have had a backup alarm that sounded in neutral if the backhoe was rolling backwards. *Id.* at 4.

> Opinion 2: Dimas agrees with the statements of Fulghum regarding the testimony of Deere's expert, Steve Wienkes. *Id.* at 4-14.

> Opinion 3: Dimas is not an expert in perception-reaction time but if

the backhoe alarm had sounded when the backhoe rolled backwards in neutral, Banda would have had a much better chance to get out of the excavation. *Id*. at 14.

Opinion 4: The backhoe rolled backwards (as opposed to sliding). *Id.*

Opinion 5: The backhoe operator left the backhoe in neutral and the parking brake off. *Id*.

Opinion 6: Banda did "what every laborer does working with an operator" when he entered the trench as soon as the operator was done digging, before the backhoe had moved away from the trench. *Id*. at 15.

Opinion 7: The backhoe should have had hillside assist. *Id.* at 16.

Opinion 8: The parking brake should have been set automatically and kept applied until the operator's seat was in the "dead forward" position. *Id*. at 8.

Opinion 9:

    a. The backhoe contained a design defect.
    b. The backhoe was being used or misused in a reasonably foreseeable way at the time of the incident.
    c. It is feasible to include the features addressed in Opinions 1, 7 and 8.
    d. The backhoe did not meet the consumer expectation test because it did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way. *Id*. at 17.

Opinion 10: It is feasible to have mechanical backup alarms. *Id*. at 18.

Defendants challenge all of Dimas's opinions except for Opinion 2 and Opinions 9(b) and (d). First, Defendants contend Opinions 1, 7, 8, 9(a) and (c) and 10 should be excluded because they relate to the design of the Backhoe and Dimas is not qualified to offer opinions criticizing the design of the Backhoe or possible alternative designs because he has no expertise in the field of heavy equipment design. Second, Defendants assert that Dimas's Opinion 3, relating to causation, should be excluded because he concedes he is not an expert on perception-reaction time. Third, Defendants argue that Opinion 4 – that the Backhoe rolled rather than slid backwards – should be excluded because Dimas is not qualified to reconstruct the accident and also does not have a sufficient evidentiary basis to do so because his review of the record was limited. Fourth, Defendants argue that Opinion 6 should be excluded because Dimas's experience as a heavy equipment operator does not qualify him offer opinions about whether Banda met the standard of

18

care among laborers such as Banda.

b. Discussion

i. Opinions 1, 7, 8, 9(a) and (c), and 10

The Court finds that Dimas does not have the expertise to offer Opinions 1, 7, 8, and 9(a) because he does not have expertise in designing heavy equipment and therefore is not qualified to testify about whether the Backhoe *should* have had the safety features described in these opinions or whether the lack of these features constitutes a design defect. Similarly, because he is not an engineering expert, Dimas is not qualified to offer Opinions 9(c) and 10, that implementation of these features is feasible. On the other hand, he will be permitted to testify about what laborers expect with respect to how equipment operates, and how equipment is actually used at worksites as this *is* his area of expertise. *See Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010), as amended (Apr. 27, 2010) (holding that doctor was qualified to testify that prosthetic did not perform in the manner reasonably to be expected even though he did not know why it failed). These opinions may be helpful to the jury to the extent that Plaintiffs intend to rely on the consumer expectations test for establishing that the product is defective, which asks whether the product "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 418 (1978). The California Supreme Court has explained that "if the expectations of the product's limited group of ordinary consumers are beyond the lay experience common to all jurors, expert testimony on the limited subject of what the product's actual consumers do expect may be proper." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 567 (1994).[5]

---

[5] In their Reply brief, Defendants argue that the consumer expectation test does not apply in this case and therefore that these opinions are not relevant. Under California law, "a product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the relevant factors …, the benefits of the challenged design do not outweigh the risk of danger inherent in such design." *Barker*, 20 Cal.3d at 418. However, the consumer expectation test under prong one applies only where the "product, in the context of the facts and circumstances of its failure, is one about which the ordinary consumers can form minimum safety expectation." *Pannu v. Land Rover N. Am., Inc.*, 191 Cal. App. 4th 1298, 1311–12 (2011) (citation and internal quotation omitted). Therefore, a jury may be instructed to apply the consumer expectation test rather than the risk benefit test only where the court has made a determined that the "facts actually permit an inference that the product's performance did not meet the minimum safety expectations

### ii.  Opinions 3 and 4

Plaintiffs do not appear to challenge Defendants' assertion that Dimas is not qualified to offer Opinion 3 because he admits he is not an expert as to perception-reaction time.  Therefore, the motion is GRANTED as to that opinion, which Dimas may not offer.   On the other hand, the Court finds that Dimas has sufficient experience to offer Opinion 4, the Backhoe rolled rather than slid and therefore the motion is DENIED as to that opinion.

### iii.  Opinion 6

The Court rejects Defendants' assertion that Dimas does not have the expertise to offer opinions as to the standard of care related to working around backhoes.  As the Ninth Circuit has emphasized, "Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert."  *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994) (citing Advisory Committee note). As a heavy equipment operator who spent decades working on underground construction projects and using backhoes, Dimas is qualified to offer opinions about the standard of care of construction workers working around backhoes based on his experience.  *See id.*

### iv.  Opinion 9(d)

In Opinion 9(d), Dimas offers opinions related to the consumer expectations test.  Dimas will be permitted to offer opinions about whether the elements of this test is met but will not be permitted to opine on the ultimate question of whether the Backhoe was defective.[6]

### 4.  Gerald Fulghum

#### a.  Background

Gerald Fulghum is a safety engineer and a Certified Safety Professional "with over 42 years' experience in mining, tunneling and heavy civil construction safety, including 16 years with

---

of its ordinary users."  *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 568 (1994);  *see also Saller v. Crown Cork & Seal Co.*, 187 Cal. App. 4th 1220, 1233 (2010) ("In a jury case, the trial court must initially determine as a question of foundation, within the context of the facts and circumstances of the particular case, whether the product is one about which the ordinary consumer can form reasonable minimum safety expectations.").  It is premature to make this determination in this case and therefore the Court declines Defendants' invitation to preclude Dimas's opinions on the basis that the consumer expectation test does not apply.

[6] Although this issue was not raised in Defendants' motion, it was addressed at the hearing.

Cal-OSHA's Mining and Tunneling Unit." Martorano Motion Decl., Ex. 6 (Fulghum CV) at 1.

He was designated by Plaintiffs as an expert to address "the cause of the accident, the equipment

being used, the process that was in place, the respective parties, any dangerous conditions that

existed, any unsafe work practices and any unsafe equipment, and to evaluate the adequacy of the

backup alarm on the John Deere 310J." *Id*., Ex. 11 (Fulghum Dep.) at 9. In his report, he offers

the following opinions:

> Opinion 1: The Deere 310J should have had a backup alarm that sounded in neutral if the tractor was rolling backwards. *Id*., Ex. 7 (Fulghum Report) at 5.

> Opinion 2: The Deere corporate positions provided by Deere representative Thomas Weinkes are contrary to safe practices. *Id*. at 6.

> Opinion 3: The relevant OSHA rule in this case is 8 C.C.R. §1592(b) entitled "Warning Methods" and it applies to the facts of this case because the Backhoe operator had an obstructed view to the rear when the accident occurred. *Id*. at 15-16.

> Opinion 4: If a backup alarm had sounded immediately upon backing, then "there would have been only one perception/reaction time" because Mr. Banda would have been able to react to the sound of the backup alarm and not first have to be warned by the operator or bystander (who also had to perceive that the Backhoe was rolling backwards and then react). Further, "[s]ince Mr. Banda got himself out of the excavation except for his right leg with the delay in the perception /reaction times, it stands to reason he would have been able to avoid injury altogether if he had the other half second that was lost in having a coworker vocally sound an alert rather than him hearing the backup alarm sound when the backhoe started rolling back." *Id*. at 16.

> Opinion 5: The Deere 310J rolled backwards, it did not slide backwards. *Id*. at 17.

> Opinion 6: When the accident occurred, the Vulcan employee who was operating the Backhoe left it in neutral and the parking brake was not on. From a safety standpoint, this was foreseeable misuse. *Id*. at 17.

> Opinion 7: The Backhoe was rented from Herc, which probably did not know that it lacked a backup alarm that would sound when it rolled backwards in neutral, or that the brake did not automatically set when the operator seat was not in the forward position.

> Opinion 8: Other than the foreseeable misuse of Vulcan's employee Barnabee Tovar in not having the parking brake on (the 310J had to be in neutral to operate the backhoe), Vulcan did nothing wrong in this case. *Id*. at 17-18.

21

Opinion 9: Javier Banda did what he was supposed to do by getting back into the excavation and clean the dirt off of the gas pipe. He did not have to wait for the Deere 310J to move out of the way after it was done excavating.

Opinion 10: A statement by Vulcan's owner that Mr. Banda should have waited to enter the excavation until the Backhoe had moved away was an effort to shift blame away from Vulcan. *Id*. at 18-19.

Opinion 11: The Backhoe should have had hillside assist. *Id*. at 19. Fulghum testified at his deposition that he is withdrawing this opinion "to keep it simple" because the hillside assist feature would not be necessary if the Backhoe had either the backup alarm or the automatic brake set safety features addressed in his other opinions. Martorano Decl., Ex. 11 (Fulghum Dep.) at 58-59.

Opinion 12: The parking brake should have been set if the operator's seat was in any position other than dead forward. *Id*., Ex. 7 (Fulghum Report) at 19.

Opinion 13: Under both the risk-benefit test and the consumer expectation test, the Backhoe had a design defect because it did not have a backup alarm that sounded when it rolled backwards in neutral and it did not automatically engage the parking brake when the operator's seat was not in the forward position. *Id.* at 20-21.

Opinion 14: What conclusions Fulghum would have reached if he were the OSHA investigator of the accident. *Id*. at 21.

Opinion 15: Based on Fulghum's experience as a Cal/OSHA Compliance Officer, statements blaming Banda for the accident and saying the Backhoe may have slid rather than rolled are an attempt by Vulcan to avoid being issued citations for safety violations. *Id*. at 22.

Opinion 16: The Backhoe should have had mechanical backup alarms. *Id*. at 23.

Defendants ask the Court to exclude Opinions 1, 11, 12, 13 and 16 on the grounds that they involve criticisms of the design of the 310J Backhoe and propose alternative designs even though Fulghum has no experience that would qualify him to offer opinions on the design of a backhoe. Defendants further assert that Fulghum's opinions as to the alternate designs are supported by no drawings of the proposed modifications, no testing of the modified designs and no examples of any heavy construction equipment that has incorporated these features. Defendants also ask the Court to exclude Opinion 4, that it "stands to reason" Banda would have escaped injury if the Backhoe had had a backup alarm, on the basis that Fulghum admitted in his deposition that he is not an expert on perception-reaction time. *See id*., Ex. 11 (Fulghum Dep.) at 108.

b. Discussion

i.   Opinions 1, 11, 12, 13 and 16

The Court rejects Defendants' argument that Fulghum may not offer opinions about the design of the Backhoe based on his experience as a safety engineer. Experts who are qualified as safety engineers may offer opinions as to whether certain safety features are required at the conceptual level even if they do not offer specific designs for the proposed safety features. *See Furry v. Bielomatik, Inc.*, 32 F. App'x 882, 884 (9th Cir. 2002) ("[W]hile a safety engineer determines conceptually whether a safety feature is required . . . a mechanical or electrical engineer actually designs and implements the feature" and therefore expert who was a safety engineer could offer opinions about the need for certain safety features, even though he did not offer "specific designs for proposed safety features, did not render inadmissible his conclusions that such features were necessary to render the machine safe."). To the extent that Plaintiffs will be required to demonstrate that the proposed modifications can be implemented by offering the testimony of a design expert, they will also be offering the testimony of expert Myles Kitchen, an automotive electronics engineer. As discussed above, the Court finds that the opinions offered by Kitchens as to the feasibility of implementing the proposed safety features is admissible.

ii.   Opinion 4

The Court agrees with Defendants that Fulghum's Opinion 4 should be excluded. Fulghum concedes that he is not an expert on perception-reaction time. And while he testified at his deposition that a one-second perception reaction time is used as a rule of thumb, he also testified that perception-reaction time depends on a "lot of . . . factors." Martorano Decl., Ex. 11 (Fulghum Dep.) at 108. As it is not apparent that Fulghum considered these factors – or is qualified to do so – the Court concludes that Opinion 4 must be excluded under Rule 702.

iii. Opinion 13

In Opinion 13, Fulghum offers opinions related to the risk-benefit test and the consumer expectations test. Fulghum will be permitted to offer opinions about whether the elements of the two tests are met but will not be permitted to opine on the ultimate question of whether the

23

Backhoe was defective.[7]

## IV.  CONCLUSION

For the reasons stated above, the Mahla and Hyland Motions are DENIED.  The Iler Motion is GRANTED in part and DENIED in part.  The Deere Motion is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated:  January 21, 2020

_____

JOSEPH C. SPERO
Chief Magistrate Judge

---

[7] Although this issue was not raised in Defendants' motion, it was addressed at the hearing.